George P. SHULTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff-Appellant,

v.

FIRST VICTORIA NATIONAL BANK,
Defendant-Appellee.

George P. SHULTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff-Appellant,

v.

AMERICAN BANK OF COMMERCE,
Defendant-Appellee.

Nos. 26960, 26971.

United States Court of Appeals
Fifth Circuit.

Nov. 28, 1969.

Rehearing Denied and Rehearing En
Banc Denied Jan. 12, 1970.

Charles Donahue, Solicitor of Labor, Robert E. Nagle, Anastasia T. Dunau,

Attys., Bessie Margolin, Associate Solicitor, Edward D. Friedman, Harold C. Nystrom, U. S. Dept. of Labor, Washington, D. C., M. J. Parmenter, Regional Atty., James E. White, James F. Gruben, Dallas, Tex., for plaintiff-appellant.

Richard Henderson, Frank Guittard, Guittard, Henderson, Jones & Lewis, Victoria, Tex., for defendant-appellee First Victoria National Bank.

William S. Fly, Victoria, Tex., Tracy Crawford, Tyler, Tex., for defendant-appellee American Bank of Commerce.

Before JOHN R. BROWN, Chief Judge, DYER, Circuit Judge, and HUNTER, District Judge.

JOHN R. BROWN, Chief Judge.

The Secretary of Labor brought these actions under one of the modern shields of women's rights [1]—the Equal Pay Act of 1963, 29 U.S.C.A. § 206(d) (1).[2] He was commissioned the champion of the female worker by the Act, which was enacted as an amendment to the Fair Labor Standards Act of 1938,[3] and seeks to recover for the female employees of these two banks [4] the difference between what they were paid and what male employees, allegedly doing equal work, received. And, in addition, he seeks to

---

1. The right of women to equal consideration at the hiring hall is protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq. See notes 22, 26, *infra,* and accompanying text.

2. "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Pro-*

*vided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

29 U.S.C.A. § 206(d) (1).

3. 29 U.S.C.A. § 201 et seq.

The authority of the Secretary to act on behalf of the workers is given by 29 U.S.C.A. § 206(d) (3), which provides: "For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter."

And, 29 U.S.C.A. § 216(c) empowers the Secretary to *bring civil action* on behalf of employees to recover such "minimum wages or unpaid overtime compensation."

4. These cases involve banks that are both located in Victoria, Texas, First Victoria

enjoin the banks from future discrimination.

■ It is the Secretary's contention that these relatively small banks paid women bookkeepers and tellers substantially less than was paid to male employees performing the same work. He relies heavily on the actual pay differentials at both the First Victoria National Bank [5] and the American Bank of

National Bank and the American Bank of Commerce of Victoria. Both cases involve essentially the same factual pattern and the same legal questions. The cases were heard on consecutive days by the District Court and disposed of by that Court in a single memorandum opinion. They were argued together before us, each bank separately represented.

5. The following tables illustrate the comparative pay rates for the male and female employees in the First Victoria National Bank. The male employees are listed in italics. "P & R" teller means "paying and receiving teller." Future references will be to the line and column.

FIRST VICTORIA NATIONAL BANK

Table A

| Item | Employee and Date of Hiring | Monthly Salary and Work Assignment | | | | |
|---|---|---|---|---|---|---|
| | | (a) 7/61 | (b) 10/64 | (c) 10/65 | (d) 7/66 | (e) 10/66 |
| 1. | Gary Prai hired 6/58 | $300 (p&r teller since 1/61) | 325 (p&r teller) | 340 (p&r teller) | 340 (note teller since 1/66) | 350 (drive-in teller) |
| 2. | LaRose Halsey hired 1/46 | $290 (p&r teller since 4/46) | 290 (p&r teller) | 300 (p&r teller) | 300 (p&r teller) | 300 (p&r teller) |
| 3. | Rubye O'Neill hired 5/53 | $270 (p&r teller since 9/54) | 290 (p&r teller) | 305 (p&r teller) | 305 (p&r teller) | 305 (p&r teller) |
| 4. | Patsy Sanders hired 11/55 | $250 (p&r teller since 1/57) | 270 (p&r teller) | 285 (p&r teller) | 285 (p&r teller) | 285 (p&r teller) |
| 5. | Florence Payne hired 8/53 | $270 (mail teller since 1/59) | 300 (mail teller) | 315 (mail teller) | 325 (mail teller) | 325 (mail teller) |
| 6. | Vivian Campbell hired 8/58 | $260 (mail teller since 1/59) | 280 (note teller) | 290 (note teller) | 300 (note teller) | 300 (note teller) |
| 7. | Elaine Shutter hired 4/49 with interruptions totalling 2-1/2 years | $265 (exch. teller since 1/61) | 285 (exch. teller) | 295 (exch. teller) | 295 (exch. teller) | 305 (exch. teller) |
| 8. | Jean Ann Payne hired 2/51 with interruptions totalling 7 years | $260 (note teller since 10/57) | 290 (sav. teller since 1/64) | 305 (sav. teller) | 315 (sav. teller) | 315 (sav. teller) |

[A717]

*Table B*

| Item | Employee and Date of Hiring | (a) 4/65 | (b) 7/65 | (c) 1/66 | (d) 4/66 | (e) 7/66 | (f) 10/66 |
|---|---|---|---|---|---|---|---|
| 1. | James Novak hired 12/64 | 240 (p&r teller since 1/65) | 250 (p&r teller) | 275 (comm. teller since 1/66) | 285 (comm. teller) | 300 (comm. teller) | 315 (comm. teller) |
| 2. | Evelyn Langston hired 12/64 | $230 (p&r teller since 12/64) | 240 (p&r teller) | 250 (p&r teller) | 250 (p&r teller) | 260 (p&r teller) | 260 (p&r teller) |
| 3. | Sarah Gastings hired 1/65 | $230 (p&r teller since 4/65) | 240 (p&r teller) | 250 (p&r teller) | 250 (p&r teller) | 260 (p&r teller) | 270 (p&r teller) |
| 4. | Jalayne Alkak hired 10/64 | $230 (book-keeper since 1/65) | 230 (book-keeper) | 240 (book-keeper) | 250 (p&r teller) | 250 (p&r teller) | 260 (p&r teller) |

[A720]

Commerce of Victoria [6] to demonstrate this. The banks, however, argued that there has been no violation of the Equal Pay Act. First, they contended the in-

6. The comparative rates of pay for the American Bank of Commerce are set out in the following tables in which the male employees are listed in italics and future references will be to the line and column.

## AMERICAN BANK OF COMMERCE

### Table C

| Item | Employee and Date of Hiring | Monthly Salary and Work Assignments Held | | | |
|---|---|---|---|---|---|
| | | (a) 6/65 | (b) 1/66 | (c) 6/66 | (d) 1/67 |
| 1. | *Edwin Wagner* (hired 5/65) | $325 | 325 | 350 | 350 |
| | | worked as bookkeeper, drive-in teller, note teller | | | |
| 2. | *Earl Smith* (hired 10/65) | $— | 325 | 350 | — |
| | | worked as bookkeeper, drive-in teller, note teller | | | |
| 3. | Sandra Hester (hired 6/61) | $275 | 290 | 290 | 325 |
| | | worked as bookkeeper, proof operator, drive-in teller | | | |
| 4. | Velma Hennig (hired 12/55 with interruptions totaling 3 years) | $250 | 275 | 275 | 300 |
| | | worked as bookkeeper, paying and receiving teller, head teller | | | |
| 5. | Lillian Berger (hired 9/62 with 3 years previous employment at same bank) | $280 | 300 | 300 | 350 |
| | | worked as proof operator, bookkeeper, collection teller, note teller, paying and receiving teller | | | |
| 6. | Frances Steffens (hired 9/63) | $245 | 270 | 270 | 300 |
| | | worked as paying and receiving teller, collection teller, drive-in teller | | | |
| 7. | Beatrice Ryback (hired 10/63) | $240 | 255 | 255 | 270 |
| | | worked as bookkeeper | | | |
| 8. | Ruby Mallette (hired 11/65) | $— | 217 | 230 | 270 |
| | | worked as drive-in teller | | | |
| 9. | Helen Billo (hired 10/65) | $— | 217 | 230 | 245 |
| | | worked as bookkeeper | | | |
| 10. | Bernice Hoxworth (hired 10/66) | $— | — | — | 250 |
| | | worked as drive-in teller | | | |
| 11. | Ferrell Matthews (hired 12/65) | $— | 217 | 230 | 260 |
| | | worked as bookkeeper and drive-in teller | | | |

equality in pay was due to differences in the work performed. Second, they claimed that the differential was, to quote the statute, based on a "factor other than sex". (See note 2, *supra.*) This factor was "a bona fide training program"—a "factor other than sex" approved by the Secretary's Interpretative Bulletin. 29 C.F.R. § 800.148.[7] The Secretary makes a triple response by

*Table D*

| Item | Employee and Date of Hiring | Monthly Salary and Work Assignments Held | | | |
|---|---|---|---|---|---|
| | | (a) 6/64 | (b) 1/65 | (c) 1/66 | (d) 6/66 |
| 1. | Lester Dorton (hired 2/63) | $325 | 350 | 400 | 425 |
| | | worked as bookkeeper, drive-in teller, note teller, assistant cashier | | | |
| 2. | Lillian Berger (hired 9/62 with 3 yrs. previous employment at same bank) | $265 | 280 | 300 | 300 |
| | | worked as proof operator, book-keeper, collection teller, note teller, paying and receiving teller | | | |
| 3. | Sandra Hester (hired 6/61) | $260 | 275 | 290 | 290 |
| | | worked as bookkeeper, proof operator, drive-in teller | | | |
| 4. | Velma Hennig (hired 12/55 with inter-ruptions totaling 3 years) | $250 | 250 | 275 | 275 |
| | | worked as bookkeeper, paying and receiving teller, head teller | | | |
| 5. | Delores Watkins (hired 4/56) | $325 | 340 | 355 | 355 |
| | | worked as proof operator, collec-tion teller, paying and receiving teller | | | |
| 6. | Carrie Bergman (hired 6/57) | $325 | 340 | 355 | 355 |
| | | worked as bookkeeper, drive-in teller, paying and receiving teller | | | |

[A719]

---

7. The Secretary's Interpretative Bulletin provides:

"Employees employed under a bona fide training program may, in the furtherance of their training, be assigned from time to time to various types of work in the establishment. At such times, the employee in training status may be performing equal work with nontrainees of the opposite sex whose wages or wage rates may be unequal to those of the trainee. Under these circumstances, provided the rate paid to the employee in training status is paid, regardless of sex, under the training program, the differential can be shown to be attributable to a factor other than sex and no violation of the equal pay standard will result. Training programs which appear to be available only to employees of one sex will, however, be carefully examined to de-

attempting to show that (1) the jobs performed by the employees were the same, (2) the alleged training program was not a "bona fide training program" within the meaning of the Department's Interpretative Bulletin nor (3) was it a "factor other than sex" within the meaning of the statutory exception.[8]

█ The District Court found it unnecessary to pass on the similarity of the various jobs performed by the employees involved here since it found that the pay differential was based upon a "bona fide training program."[9] Since this approach impliedly assumed that there was in fact unequal pay for equal work we need consider only whether the District Court was correct in its construction of the statute and of the Interpretative Bulletin. Since we believe that the training program found to exist and to be the basis of the unequal pay was neither a "bona fide training program" within the meaning of the Bulletin nor within the statutory exemption,[10] we must reverse and remand the cases for the District Court to compare the jobs performed by the employees involved here and decide whether in fact under the appropriate burden of proof there was unequal pay for equal work.

█ The training programs that the District Court found to exist and to be the justification for the unequal pay were informal, unwritten,[11] and, if not imaginary, consisted of little more than the recognition of the ability of employees to work their way up the ranks. The training program was supposed to provide rotation for the "trainee" through the various departments of the bank so the employee would more fully compre-

termine whether such programs are, in fact, bona fide. In an establishment where a differential is paid to employees of one sex because, traditionally, only they have been considered eligible for promotion to executive positions, such a practice, in the absence of a bona fide training program, would be a discrimination based on sex and result in a violation of the equal pay provisions, if the equal pay standard otherwise applies."
29 C.F.R. § 800.148.

8. The District Court apparently labored under the belief that the Secretary had the burden of proving that there were no applicable exceptions. This was clearly error. It has long been established that the employer has the burden of proving exemptions under the Fair Labor Standards Act. Arnold v. Ben Kanowsky, Inc., 1960, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393, 396; A. H. Phillips, Inc. v. Walling, 1945, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095, 1099. With reference to the Equal Pay Act see Wirtz v. Basic, Inc., D. Nev., 1966, 256 F.Supp. 786, 790; Wirtz v. Wheaton Glass Co., D.N.J., 1968, 284 F.Supp. 23, 33. This has a marked bearing on the F.R.Civ.P. 52(a) clearly erroneous standard. See note 10, infra.

9. The District Court in its memorandum opinion said:
"In the view I take of the case, it is unnecessary to make the job com-

parisons. I am convinced, and find, that in each case it was the plan and purpose of the defendant bank to train the male employees here concerned for officer positions; that it was a part of such plan that each such employee would work for a limited period of time in each of the departments of the bank better to learn its operations, its functions, and its problems; that it was for this reason, and this alone, that the higher wages were paid; and that the sex of the employee was not a factor entering into this determination of wages to be paid. This constituted a bona fide training program (see Section 800.148, Interpretative Bulletin, Title 29, Part 800, U. S. Department of Labor), available to both male and female employees, pursuant to which the wage differentials were fully justified."

10. Fact or fact-legal conclusions induced by erroneous legal standards do not have the F.R.Civ.P. 52(a) clearly erroneous insulation. United States v. Singer Mfg. Co., 1963, 374 U.S. 174, 194 n 9, 83 S.Ct. 1773, 1784, 10 L.Ed.2d 823, 838; Manning v. M/V "Sea Road", 5 Cir., 1969, 417 F.2d 603, A.M.C.

11. After the investigation in this case was commenced by the Secretary, the American Bank of Commerce on Oct. 1, 1966 presented the Secretary with a formal, written program. The program, however, has not been put into effect.

hend the banks' operations. Such rotation of the male "trainees" was, however, not distinguishable from the normal course of employment for the female employees.[12] The rotation of the "trainee" has apparently been unpredictable, sporadic, and unplanned. The time spent in each department varied widely and was in fact based not upon any concept of training but upon the banks' personnel needs.[13]

Moreover, there was no definite understanding or agreement between the banks and their male employees concerning a training program. Mr. Sheffield, Vice President of First Victoria in charge of personnel, testified that when he hired an employee he did not know if that employee would be "trained" to be an officer.[14] Yet, the male employees were

started at substantially higher salaries than female employees performing the same task. For example, Gary Prai started work for First Victoria in 1961 as a paying and receiving teller at $300.00 a month (Table A, Item 1, col. a), while LaRose Halsey, who had worked at the position since 1946 (Table A, Item 2, col. a), received only $290.00 per month.[15]

Thus it is apparent that the training programs that the District Court found to exist and be the motivation for the discrimination were not specific and their metes and bounds were at best poorly surveyed. As structured and operated it was little more than a post-event justification for disparate pay to men and women from the commencement of employment up through advancement. The training was essentially the acquiring

12. For example, in the American Bank, Lillian Berger has been a proof operator, a bookkeeper, a paying and receiving teller, a collection teller and a note teller (Tables C & D, Items 5 & 2 cols. a–d); Frances Steffens worked as a paying and receiving teller, a drive-in teller and a collection teller (Table C, Item 6, cols. a–d); Delores Watkins has been a proof operator, a paying and receiving teller and a collection teller (Table D, Item 5, cols. a–d); Sandra Hester has been a proof operator, a bookkeeper, and a drive-in teller (tables C & D, Item 3, cols. a–d); Carrie Bergman has worked as a bookkeeper, a drive-in teller and a paying and receiving teller (Table D, Item 6, cols. a–d); and Velma Hennig has been a bookkeeper, a paying and receiving teller and a head teller (Tables C & D, Item 4, cols. a–d). And, in the First Victoria Bank Florence Payne had worked as a bookkeeper, a paying and receiving teller and a mail teller (Table A, Item 5, col. a); Jean Ann Payne had worked as a bookkeeper, note teller, and savings teller (Table A, Item 8, cols. a–b); and all the other women cited in the above tables, except Evelyn Langston, had worked in at least two departments.

13. For example, the First Victoria Bank employee Gary Prai, one of the male "trainees" (Table A, Item 1, cols. a–d) worked as a paying and receiving teller for five years. As Table A indicates he received wages higher than the female employees in that department for the

entire time. In addition, the American Bank of Commerce kept Lester Dorton "training" as a note teller for two years (Table D, Item 1, cols. a–d). These times should be compared with two and six months respectively, provided as training periods in these departments in American's formal plan. See note 11, *supra.*

14. Mr. Sheffield said:
"As far as I was concerned when I employed them. I think I can tell if they have the potential. But I certainly wouldn't want to say right there, 'That is the one we are going to train for an officer.' It would depend a lot of their development later on, and it would be over a gradual period of time: I don't think there is anyone today where we could say that is it."

Apparently, the training program at the American Bank of Commerce was somewhat more explicit, but it too amounted to little more than an understanding that the male employees—or "trainees"—could, if they performed well over some indefinite period, become officers.

15. The difference was exaggerated as time passed, although there is no indication that Prai was selected to train to be an officer. In 1965 he received $340 (Table A, Item 1, col. c) per month as a paying and receiving teller while Halsey received only $300 (Table A, Item 2, col. c).

of skills, and experience and knowledge of the business through continued performance of regular tasks.[16] In this sense every job in every type of business would be training, and nothing would be left for the operation of the Interpretative Bulletin Training program. This was not the Secretary's intention. In addition, the imprecision, in and of itself, of the Banks' training program is not in keeping with the Secretary's Interpretative Bulletin on training programs. (See note 7, *supra*).

■■ Moreover, such imprecise programs are outside the scope of the broad statutory exception—"a factor other than sex"—(See 29 U.S.C.A. § 206(d)(1) (iv)) because they are not in harmony with the Congressional purpose: The elimination of those subjective assumptions and traditional stereotyped misconceptions regarding the value of women's work.[17] These programs are inconsistent since in actual operation the work and role of the male employees—"trainees" cannot be distinguished from the female workers who do the same jobs and who are likewise learning and growing in the business but without the title of trainee.

The Congressional purpose is clear whether divined by traditional doctrines of statutory construction or, more plausibly, the legislative history with respect to the statutory exception. This legislative intent is expressed by the report of the House committee that favorably reported the bill to the floor:

"This language recognizes that there are many factors which may be used to measure the relationships between jobs and which establish a valid basis for a difference in pay. These factors will be found in a majority of the job classification systems. Thus, it is anticipated that a bona fide job classification program that does not discriminate on the basis of sex will

---

16. This is reflected by this excerpt from the Victoria National Bank's *Employee's Handbook:*

"Employee Training

A large proportion of the people in The Victoria National Bank hold responsible positions as officers and other supervisory positions. Nearly all of these individuals have come up from the ranks. They started at the bottom and learned each step of banking on the way up.

It takes time to learn banking but ability is quickly recognized. This means that you also can advance as you acquire the knowledge and develop the judgment necessary for supervisory positions. This does not mean that every one who enters our bank will advance rapidly to an officer's position. Promotion will depend on the progress you make in preparing yourself for advancement and the openings in our bank. There is a great variety of interesting jobs in this bank, and there are many ways by which you can speed up your preparation for promotions when openings occur."

17. Representative Donahue speaking in behalf of this legislation characterized the need for the Equal Pay Act to eliminate these assumptions:

"We all realize that the origin of the wage rate differential for men and women performing comparable jobs is the false concept that a woman, because of her very nature, somehow or other should not be given as much money as a man for similar work. This antiquated concept has been long and completely demonstrated to be false and it is indefensible from every standpoint. This being so, we may wonder why this legislation is necessary.

The answer is furnished to us in the authoritative information provided by witnesses before the House Committee on Education and Labor and the impressive array of statistics unhappily proving that discrimination in wage payments, on the basis of sex alone, continues to exist even in this modern space age.

Recognizing that the concept of wage payment discrimination against women is false; having before us the surprising but overwhelming evidence that such discrimination still continues to exist; * * * this measure represents the correction of basic injustice being visited upon women in many fields of endeavor * * * extending simple wage justice to the increasing corps of America's working women." 109 Cong.Rec. 9212.

serve as a valid defense to a charge of discrimination.

Three specific exceptions and one broad general exception are also listed. It is the intent of this committee that any discrimination based upon any of these exceptions shall be exempted from the operation of this statute. As it is impossible to list each and every exception, the broad general exclusion has been also included. Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on experience, training, or ability would also be excluded. It also recognizes certain special circumstances, such as "red circle rates." This term is borrowed from War Labor Board parlance and describes certain unusual, higher than normal wage rates which are maintained for many valid reasons. For instance, it is not uncommon for an employer who must reduce help in a skilled job to transfer employees to other less demanding jobs but to continue to pay them a premium rate in order to have them available when they are again needed for their former jobs."

109 Cong.Rec. 9210.

■ Important as are the exceptions, to sustain these so-called training programs as a justification for disparate pay would mean that "the exception will swallow the rule." Weeks v. Southern Bell Tel. & Tel. Co., 5 Cir., 1969, 408 F.2d 228, 235. And, this "rule"—equal pay for equal work—was not laid down simply out of concern about the injustice of discrimination,[18] important as that was. It was also laid down out of concern about the economic and social consequences of disparate wages[19] paid to a major portion of the nation's labor force.[20] Such wages not only depressed

---

18. The Chairman of the Senate Subcommittee that reported the bill said:

"Justice and fairplay speak so eloquently in behalf of the equal pay for women bill that it seems unnecessary to belabor the point. We can only marvel that it has taken us so long to recognize the fact that equity and economic soundness support this legislation."

Statement by Sen. Hart, 109 Cong.Rec. 8916.

19. The purpose of the Act as set out in the statute is:

"Sec. 2. (a) The Congress hereby finds that the existence in industries engaged in commerce or in the production of goods for commerce of wage differentials based on sex—

(1) depresses wages and living standards for employees necessary for their health and efficiency;

(2) prevents the maximum utilization of the available labor resources;

(3) tends to cause labor disputes, thereby burdening, affecting, and obstructing commerce;

(4) burdens commerce and the free flow of goods in commerce; and

(5) constitutes an unfair method of competition.

(b) It is hereby declared to be the policy of this Act, through exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct the conditions above referred to in such industries."

Public Law 88-38 (1963), 77 Stat. 56.

20. President Kennedy, in signing the Equal Pay Act, summarized the conditions which necessitated such a law, as follows:

"[T]he average woman worker earns only 60 percent of the average wage for men * * *. Our economy today depends upon women in the labor force. One out of three workers is a woman. Today, there are almost 25 million women employed, and their number is rising faster than the number of men in the labor force. It is extremely important that adequate provision be made for reasonable levels of income to them, for the care of the children * * * and for the protection of the family unit * * *. Today one out of five of these working mothers has children under three. Two out of five have children of school age. Among the remainder, about 50 percent have husbands who earn less than $5,000 a year—many of them much less. I believe they bear the heaviest burden of any group in our nation * * *." [Remarks of the President at signing the Equal Pay Act on June 10,

the living standard of those who received them, they also depressed wages for all workers and particularly workers in certain industries.[21]

Nor is any such swallowing of the "rule" compelled or suggested by our recent construction of that other rank in the phalanx of legislation designed to protect the employment rights of women—equal job opportunity—conferred by Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq.[22] In Phillips v. Martin Marietta Corp.,[23] we held that there was no discrimination based on sex when another criterion of employment, even one related as closely

---

1963, XXI Cong.Q. No. 24, p. 978 (June 14, 1963).]

At the Senate Hearings, Secretary of Labor Wirtz pointed out:

"Women's earnings, in many families, are a substantial factor in meeting living costs. *Married women*, for example, *accounted for over one-half of the total number of women workers in 1962.* Nearly 900,000 working women had husbands who, for various reasons, were not in the labor force, primarily because they were disabled or retired. The proportion of working wives is materially higher among families in the low-income groups." [1963 Senate Hearings, p. 16]

See also Representative Green (109 Cong.Rec. 9199):

"There are approximately 25 million working women in the labor force today, and we are simply asking, by this legislation, to look at the facts as they face us in 1963, in instances where there is unequal pay. * * * Women are the heads of 4.6 million families in the United States; one-tenth of all the families in this country. Nearly one million working women have husbands who are not employed, mainly because they are disabled or retired. Nearly 6 million working women are single. The proportion of married women who work is materially higher in the low-income families, and, according to the testimony that was presented to the committee, some 7.5 million women workers supplement the income of male wage earners who make less than $3,000 a year. Women's wages average less than two-thirds of the wages paid men."

21. During the debate of the bill on the House floor Congressman Ryan said that "wage discrimination based on sex should have no place in our American economic structure. As long as such discrimination exists, whether against men or women, the American economy will suffer." Statement by Rep. Ryan, 109 Cong.Rec. 9212. During the debate of the 1962 bill, which was substantially

similar to the final legislation, it was said that men "workers as well as women workers, their families, and employers benefit from equal pay. Women benefit by receiving the rate for the job instead of a lower rate based on sex. Men benefit through increased job security since employers are discouraged from replacing them with lower paid women." Statement by Rep. Pucinski, 108 Cong.Rec. 14757.

It is of significance here that the banking industry, which is noted for low wages, was given particular attention:

"Another representative group of whitecollar workers are bank tellers, for whom salary data were collected by the Bureau of Labor Statistics in 1960. Even though the salary data were separated by the length of experience of the tellers and the type of work done, women's average earnings were consistently lower than men's. For example, * * * women note tellers with under 5 years' experience typically averaged $5 to $15 a week less than men in the same occupational group." [Hearings before the Special Subcommittee on Labor, on H.R. 3861, 88th Cong., 1st Sess., p. 20.]

22. The basic prohibition in Title VII— § 703(a) of the Statute—provides:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C.A. § 2000e–2.

23. 5 Cir., 1969, 411 F.2d 1 (See 416 F.2d 1257 on Petition for Rehearing en banc).

to sex as motherhood, is coupled with sex. 411 F.2d at 3–4. Here, however, under the training program relied upon as the justification for unequal pay there was lacking "any factor other than sex", since the work performed and the employment roles of the male and female employees were the same. Thus it was sex itself.

This is borne out also by the discriminatory manner in which these training programs were administered.[24] Since the commencement of this proceeding both banks made female employees officers.[25] Both banks thus obviously recognized that some of their women employees had the capacity and the drive to become officers. Both banks, nevertheless, included none of these women in the "training programs". Thus the system starts with discrimination on sex with no showing yet that any exception would justify it. This will be true whether this is an Equal Pay Act problem or a Title VII[26] problem and whether the differential justification is based on the exceptions in the Equal Pay Act, the business-justification exception of § 703(e) of Title VII, 42 U.S.C.A. § 2000e–2(e), or concepts akin to Phillips v. Martin Marietta Corp., supra.

■ These vague, almost illusory, training programs that were applied in a discriminatory manner may have been "a better reason"[27] than the maleness or femaleness of employees for the inequality in pay. But, they were not "factors other than sex" within the meaning of the Equal Pay Act.

Reversed and remanded.[28]

## ON PETITIONS FOR REHEARING AND PETITIONS FOR REHEARING EN BANC

Before JOHN R. BROWN, Chief Judge, DYER, Circuit Judge, and HUNTER, District Judge.

Miss McMullen and Mrs. Hildebrand, both Assistant Cashiers.

---

24. For example, the American Bank employed Lillian Berger for $300.00 per month in January, 1966. (Table C, Item 5, col. b). She had worked in five departments of the bank, the Vice President in charge of personnel testified she was considered officer material, and she had been with the bank since September 1962. Yet, Lester Dorton who was employed in February 1963 and had worked in four departments received $400.00 per month (Table D, Item 1, col. c).

Another significant example by the same bank is the hiring of Earl Smith, who was hired, after eighteen months experience with another bank, to be in charge of the drive-in window. He was paid $325.00 per month, six months later $350.00 per month (Table C, Item 2, cols. b, c). After he moved to another position Bernice Haxworth, who had had ten years experience at another bank, was hired to take his place. She was paid $250.00 per month, six months later $250.00 per month. (Table C, Item 10, col. d).

25. The American Bank of Commerce had, at the time this case was tried, made Mrs. Jane Lassman an Assistant Cashier and indicated that Mrs. Lillian Berger would soon become an officer. The First Victoria Bank had two female officers,

26. Although we need not here decide whether or to what extent, it appears that Title VII overlaps the coverage of the Equal Pay Act since both apply to disparate wages. Title VII § 703(a) in part provides that it is unlawful to discriminate with respect to "compensation, terms, conditions, or privileges of employment * * *" on the basis of sex. 42 U.S.C.A. § 2000e–2(a) (1). See note 22, supra.

27. In its opinion the District Court said: "I am convinced where, for example, in January, 1966, the defendants could secure the services of a competent note teller for $230 per month (as it could, e. g., Mrs. Bolting), it would not, and did not, pay Mr. Prai $340 to do the same work simply because he was a male. The bank had a better reason for paying the extra money."

28. This record rules out the training program as an effective (iv) exception. On remand the Court, on this record or as appropriately amplified, will determine whether the differentials can be justified on the basis of job comparison or under (i) (ii) (iii) or otherwise under (iv) as "any factor other than sex".

**660**

PER CURIAM.

The Petitions for Rehearing are denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petitions for Rehearing En Banc are denied.