George P. SHULTZ, Secretary of Labor, U. S. Department of Labor, Plaintiff,

v.

KIMBERLY–CLARK CORPORATION et al., Defendants.

Civ. No. 67–258.

United States District Court, W. D. Tennessee, W. D.

July 28, 1970.

**1324**

Percy H. Green, U. S. Dept. Labor, Nashville, Tenn., Benjamin G. Usher, U. S. Dept. Labor, Washington, D.C., for plaintiff.

J. Fraser Humphreys, Anthony J. Sabella, Thomas A. Buford, Memphis, Tenn., for defendants.

## OPINION

ROBERT M. McRAE, District Judge.

This action was brought by the Secretary of Labor to enjoin Kimberly-Clark Corporation (hereinafter called employer) and the defendant unions from violating the equal pay provisions of the Fair Labor Standards Act. Plaintiff charges that the employer has violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), which prohibits paying discriminatory wages on the basis of sex, and that the unions have violated 29 U. S.C. § 206(d)(2) by causing, or attempting to cause, the employer to discriminate in violation of § 206(d)(1). Plaintiff also seeks to restrain the employer from withholding payment of any wages due the employees as a result of the violation.

The applicable section of the Fair Labor Standards Act, 29 U.S.C. § 206(d)(1) is as follows:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

The Secretary of Labor alleges that the employer pays women less in fourteen separate jobs which require greater or "equal skill, effort and responsibility" than one or more of nine jobs formerly performed exclusively by men. The employer denies that the lower paying jobs are equal in skill, effort and responsibility performed under similar working conditions and further says that if they are equal within the meaning of the Act the exception set forth in (iv) applies in that the difference in pay is based upon factors other than sex, namely, job content.

If there is discrimination, the period to be considered for back pay commenced September 22, 1965, two years before the complaint was filed.

The employer produces paper products on a world-wide basis and has one of its sixty facilities located in Memphis, Tennessee. The Memphis Mill employs approximately 1500 people in all phases of its operations in a plant covering 37 acres. The instant suit concerns some of the 700 employees in the converting department of the Memphis Mill. Although other products are made in Memphis, the employees involved herein are concerned with the separate sections which produce Kotex feminine napkins, Kleenex facial tissue, Delsey bathroom tissue and table napkins.

The converting department receives the products which have been processed from pulp in the manufacturing section and are sent to the various converting department sections for further processing, in the form of cutting, folding and packaging. In the converting department the various products are packaged for retail sale or industrial use in boxes or see-through wrapping and further packaged in shipping cartons, which are fed on to a cross-mill conveyor belt which, in turn, transports them to the shipping department. Most of the processing in the converting department is done by machines, which the record shows are constantly being improved upon by the latest technology.[1] The employees are required variously to properly feed the machines with products, to observe the operation of the machines, to remove the products in process from the machines, to visually inspect the products and packaging and to pack manually some of the products in shipping cartons.

In addition to developing and acquiring machinery of varying intricacies, the employer must vary the production schedules continuously to meet the many demands of its customers. The employer uses over one hundred production codes in the Memphis mill. For example, Delsey Tissue is packaged in single rolls for commercial consumers, such as motels, in twin pack rolls with see-through wrappers for shipment in a variety of colors for resale in retail outlets; and, on other occasions, the production code calls for four or six roll packages. The Kotex product has even more variables in the individual product and its packaging. Facial tissue is varied by the size and color of the product and the quantity in a box. In addition, it is packaged in a small number of tissues in what is known as "Pocket Packs". This requires an entirely different processing from the boxed facial tissue.

In June 1964, when the Equal Pay Act became effective for the employer, the operations of the employer had evolved over a period of many years by its needs and improved techniques, and by collective bargaining on an annual basis, to a set of job classifications based in the various product sections. Lines of progression based upon seniority by sections were established in the collective bargaining agreements.

Certain job classifications were exclusively for women and some were exclusively for men. In this evolutionary process the heavier duties in the plant, such as handling large rolls of products or large cartons, were assigned to men and the lighter jobs which permitted sitting for part of the time were assigned to women. This was partially motivated by the state laws regulating maximum working hours and working conditions for women. The rates of pay in the women's jobs in the various sections were, for the most part, lower than the

---

1. An example of this is the multifold section which was installed in stages in 1965. In this section the multifolder simultaneously unwinds 280 rolls of facial tissue and produces 250 folded and stacked clips of Kleenex tissue per minute. These clips are put in individual boxes by machines and these boxes are then conveyed to another machine which boxes them and seals them in shipping cartons.

rates in the men's jobs. For example, in the Feminine Napkin section there were eight different jobs in the men's line of progression which varied in the hourly rate of pay between $2.33 and $2.99 and, in the same section, there were seven different jobs in the women's line of progression which varied from $2.24 to $2.37 per hour. Labor Agreement effective August 1, 1965 (Ex. to Answers to Plaintiff's interrogatories filed January 19, 1968).

When the Labor Agreement which became effective August 1, 1965, was negotiated, in addition to the Equal Pay Act of 1963, the Civil Rights Act of 1964 had been enacted. In early 1964 the Personnel Superintendent of the employer had surveyed and considered various job classifications and reported that the employer was not in violation of the Equal Pay Act (Tr. 1152). However, the separate lines of progression for men and women were realized to be a problem under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., but no guidelines had been issued and the 1965 Labor Agreement was executed with job classifications similar to those of former years. Officials of the employer determined that separate lines of progression for men and women denied the women the full opportunities for promotion and therefore negotiations between the employer and the union representatives concerning this problem were conducted in the fall of 1965. This resulted in an amendment to the then existing Labor Agreement, effective December 27, 1965. The amendment caused a change of duties in some job classifications, such as reassigning some relatively infrequent duties requiring heavy lifting from some former male classifications which would then permit more women to perform the former male jobs. The classifications were assigned designations of heavy, medium and light, and the company doctor and management personnel evaluated and graded every employee by health, size and strength standards as heavy, medium and light, without regard to sex. The employees were also consulted in this evaluation and were allowed a voice in the classification given them.[2]

The former men and women lines of progression were merged and jobs were assigned in all sections, without regard to sex, on the basis of seniority and the classifications of heavy, medium or light. While it is true that most men and women remained in their former job classifications, many women did change jobs and some were moved into other product sections at higher pay. On November 25, 1968, there were 67 women in 13 former male job classifications and 79 men in 7 former female classifications (T. E. 26).

■ The burden of proof on the issue of discrimination as specifically defined in the Act is upon the plaintiff. Shultz v. Wheaton Glass Co., 421 F.2d 259 (C. A. 3, 1970).

■■ The term "equal" as used in the Act means "substantially equal," not identical. Shultz v. Wheaton Glass Co., supra; Murphy v. Miller Brewing Co., 307 F.Supp. 829 (E.D.Wis.1969). It has been held that the fact that men perform other type services for a small percentage of their time does not prevent jobs that are otherwise the same from being substantially equal. Shultz v. American Can Co., 424 F.2d 356 (C.A. 8, 1970). However, differences in genuine job classifications were intended to be excepted from the Equal Pay Act of 1963. Congress subsequently passed Title VII of the Civil Rights Act of 1964 which prohibits discrimination because of sex in the classification of employees as well as their employment and compensation. Shultz v. Wheaton Glass Co., supra, at 265, 266.

The plaintiff undertook to prove his case primarily by 24 employees, who de-

2. The one woman who met the standards for a heavy classification declined that distinction and, at her request, was classified medium. (Tr. 1245).

scribed the different jobs from their own experience or observations and offered conclusions that certain jobs were equal in skill, effort and responsibility. The transcript is 1538 pages.

The plaintiff contends that the former female jobs listed below are equal or exceed in skill, effort and responsibility to the corresponding former male jobs in other product sections as listed below:

| FORMER FEMALE JOB | FORMER MALE JOB |
| --- | --- |
| *Kotex Pad Section* | |
| Waste Sorter | Packer — Delsey tissue<br>Packer — napkins |
| Pad Machine Operator | Folder Operator — napkins<br>Case Packer Operator — Multifold<br>Shafter — napkins<br>Container Sealer Operator —<br>  Klennex tissue, Delsey tissue & napkins<br>Packer — Delsey tissue<br>Packer — napkins |
| Super Operator Packer | Case Packer Operator — Multifold<br>Packer — Delsey tissue<br>Packer — napkins |
| Pad Inspector Packer | Packer — Delsey tissue<br>Packer — napkins |
| Carton Packer | Packer — Delsey tissue<br>Packer — napkins |
| Case Packer Operator | Case Packer Operator — Multifold<br>Packer — Delsey tissue<br>Packer — napkins |
| *Pocket Pack Section* | |
| Wrapper Packer | Packer — Delsey tissue<br>Packer — napkins |
| Carton Packer | Packer — Delsey tissue<br>Packer — napkins |
| Reliever | Packer — Delsey tissue<br>Packer — napkins |
| *Kleenex tissue Section* | |
| Interfolder Operator | Packer — Delsey tissue<br>Packer — napkin |
| Odd Grade Operator | Packer — Delsey tissue<br>Packer — napkin |
| Reliever | Packer — Delsey tissue<br>Packer — napkin |
| Packer | Packer — Delsey tissue<br>Packer — napkin |
| *Service Section* | |
| Locker Room Cleaner | Cleaner |

## FORMER MALE JOBS

The duties of a *Delsey Tissue Packer* consist of packing single rolls, twin-pack and four-pack packages of bathroom tissue into shipping containers; inspecting printed poly wrappers and rolls inside of the wrappers; pulling and pushing stack-out bins [3] on rollers that weigh over 500 pounds empty and almost a ton when full for distances up to 20 feet when full and much greater distances when empty; stacking-out or stacking-in full cases of Delsey tissue weighing 50 pounds; lifting and moving heavy oak skids weighing from 90 to over 100 pounds each for distances from 10 to 18 feet; periodically observing the wrapping machines and notifying the operator if trouble develops and weekly cleaning duties involving heavy, dirty work. The job is performed standing at all times and the overtime requirements are taxing.

The duties of the *napkin Packer* consist of packing cartons or poly wrapped packages of table napkins into containers or out of stack-out bins; inspecting the carton and wrapper and the napkins inside of the wrapper; pushing, pulling and turning bins on rollers weighing 500–600 pounds when empty and in excess of one-half ton when full; packing and lifting full cases of "sleeves" weighing 40 pounds on to skids; stacking-out full cases of napkins weighing up to 30 pounds; changing poly rolls weighing 80 to 100 pounds; machine responsibility on Battle Creek Wrapper and Redington Cartoner when the Machine Tender is temporarily unavailable, and cleaning duties in napkin section. The job is performed standing up at all times and overtime requirements are particularly high.

The duties of the *Folder Operator* consist of breaking away clips of napkins from the folder, placing them on the conveyor and inspecting the clips of napkins. This employee participates in changing hard rolls weighing over 200 pounds and has complete and sole responsibility for the operation and many adjustments of the folder machine.

The duties of the *Case Packer Operator-Multifolder* consist of forming containers and placing them on the horn of the machine which automatically packages boxes of Kleenex tissue; complete responsibility for the operation of the Case Sealer Machine; complete responsibility for the operation of the Case Packing Machine; complete responsibility for the operation of the Lane Divider Equipment; participating in the changing of 200 to 300 hard rolls on the Multifolder Machine two or three times each shift; stopping the entire Multifolder section during plugups of the Case Packing Machine or the Lane Divider Equipment and removing all plugups and making any and all mechanical adjustments required on the Case Packing Machine, Lane Divider Equipment and the Sealing Machine.

The duties of the *Shafterman* consist of stripping, preparing and handling hard rolls prior to placing them on upper and lower rollers of the folder machine in the napkins section; changing of hard rolls weighing over 200 pounds on two or three napkin folder machines; furnishing relief for two folder operators for a minimum of 80 minutes each shift; and cleaning duties, both daily and weekly. In addition, the Shafterman is required to have and to use all of the operating and mechanical knowledge and skill of the Folder Operator.

The duties of the *Container Sealer Operator* in the Kleenex tissue, Delsey tissue and Table Napkin sections consist of complete and sole responsibility for the operation and adjustment of the container sealer; responsibility for timely selection of samples from the production of each machine in the department several times each shift; weekly clean-up

---

3. The term "stackout" refers to pulling cartons of products or packaged products off the conveyors when trouble has developed down the line or when products of one color are pulled off the line for assemblage with products of another color or in shipping cartons so that the carton will contain a variety shipment.

of sealer and glue pans involving use of steam and alkali solution; removal of plugups from container sealer by use of hammers and iron crowbars when necessary; stacking full cases of product on and off the conveyor during breakdowns and jamups of both the sealer and the cross-mill conveyor.

### FORMER FEMALE JOBS

The *Waste Sorter* job consists of relieving the Pad Machine Operators, Pad Inspector Packers and Carton Packers in the Kotex pad section.

The *Pad Machine Operator* job consists of changing rolls weighing from 18 to 20 pounds on two pad machines, the maximum number of roll changes in a shift would be 268. With the exception of one rudimentary foot wheel adjustment to visually line up the gauze rolls, all the machine responsibility resides in the Pad Machine Tender who removes all plugups and makes all mechanical adjustments necessary to keep the machine operating properly. Similarly, the Pad Machine Tender is responsible for the quality of the raw materials, and the Pad Inspector Packer is responsible for quality inspection of the finished product.

The *Super Operator Packer* spends two-thirds of the time seated performing the work of the Pad Inspector Packer job and one-third of the time performing work of the Pad Machine Operator, supra.

The *Pad Inspector Packer* job is performed while sitting and consists of inspecting 12 pads (feminine napkins) and slipping them into a carton which is placed on a conveyor. This is an example of light repetitive work historically assigned to female employees in the Converting Department. This employee lifts nothing heavier than a handful of Kotex pads, and never makes machine adjustments. While the inspection function of this job is comparable with Delsey tissue and napkin packers, in that all three employees screen out poor quality of the individual product itself, the Delsey tissue and napkin packers have the additional responsibility for the final appearance attributes of the outer wrapping of the product.

The *Carton Packer* in the Kotex pad section places individual boxes, each containing either 12, 24, 48 or 56 feminine napkins, into corrugated shipping containers. The duties of this job consist of packing the production of two and a half to four machines, depending on the size of the cartons being packed; setting up the corrugated containers on the packing stand, picking up and inspecting six boxes of Kotex pads, inserting them into the shipping container, and then pushing the container on to the conveyor. Some of the employees can perform the job while sitting part of the time.

The *Case Packer Operator* in the Kotex pad section is seated next to the machine and places less than two containers a minute on the machine. This employee has no machine responsibility and if there is any malfunction or plugup, the Top and Bottom Sealer Tender makes the necessary adjustments. The record contains no evidence that the job requires any heavy lifting or making any machine adjustments. The Case Packer Operator's inspection duties are superficial, the critical close inspection of the quality having already been performed by the Pad Inspector Packers and the Top and Bottom Sealer Tender before they reach the packing stations.

The duties of the *Wrapper Packer* in the Pocket Pack section consist of taking individual clips of pocket-pack size Kleenex tissue from a chute on the interfolding machine, placing them in buckets or slotted holders on a conveyor belt, and, at a later stage after they have passed through a poly-wrapper and have been wrapped, picking them up and placing them in cartons. These various duties are performed in sequence by three Wrapper Packers who sit, or stand, in three different positions along the conveyor line. Two of plaintiff's female witnesses who had performed both the Wrapper Packer job and the Delsey Tissue Packer job, testified without equivocation that the Delsey Tissue

Packer job required more effort. (Tr. 958, 987).

The job of the *Carton Packer* in the Pocket-Pack section consists of packing into shipping cartons, wrapped packages containing 16 or 24 pocket size packages of ten sheets of Kleenex tissue. The job requires that the cartons be stamped for identification. The inspection features of the job are minimal because there are two carton packers and the package has been previously inspected by the wrapper operator.

The *Reliever* job in the Pocket-Pack section consists of relieving the Wrapper Packers and the Carton Packers whose duties are described above.

The *Interfolder Operator's*[4] duties consist of taking clips of Kleenex tissues from the interfolder machine by breaking them away from the machine in folded and sliced strips of tissues; breaking the clips in two, each portion being the ultimate contents of a standard box of Kleenex tissue, and placing each portion on a conveyor which carries them to the automatic boxing machine, or, in some cases, to the manual packing stations. This employee's principal duties consist of inspecting and preparing the clips of tissue for packaging. Additionally, this employee's duties sometimes include placing consumer coupons in the clips; watching the roll changes; cutting the machine off when necessary to avoid a roll "running through"; lining the roll; adjusting the stacking; oiling the slitter; letting down ink; and keeping records.

The *Odd-Grade Operators* are in a crew consisting of three to six employees, who rotate at half-hour intervals in each of the jobs of Interfolder Operator, hand-packing and carton packing.

All of these employees must be qualified to work as Interfolder Operators and they are paid at a rate slightly higher than that of Interfolder Operator. The Odd-Grade Operator must also measure, weigh, and test the materials produced when other than standard or regular sized tissue is being run.

The *Reliever* in the Kleenex facial tissue section provides scheduled reliefs and emergency reliefs for Interfolder Operators and Packers.

The *Kleenex Tissue Packer's* duties include bringing and mounting or setting up the corrugated containers; lifting, turning, and inspecting several cartons of Kleenex tissue (6 to as many as 12 boxes at one time); turning 90 degrees to the packing stand at the end of the table; putting these boxes into the shipping container and then pushing the container on to the conveyor. While packing the Packers also inspect the packages for "poor sealing", "tissues hanging out", torn boxes, glue, ink, and discoloration of the box. Packing assorted colors was done, although this assorted packing did not involve stacking out into bins. Full cases of extra colors, which were being packed with the color being run on the machine, were brought in and emptied on to tables by male employees.

The plaintiff also charges that the *Locker Room Cleaner* female job is equal to the male job designated as *Cleaner*. These jobs are listed in the Services section of Schedule "B" of the Labor Agreement effective August 1, 1966. These employees are not assigned to a product line of progression. Their jobs may be described as maid service and janitorial service, respectively.

4. The proof offered pertaining to the jobs of Interfolder Operator, Odd-Grade Operator, Reliever and Carton Packer in the Kleenex tissue section is very confusing because the testimony for the most part referred to the duties prior to the installation of the Multifold section in 1965, when the production of regular Kleenex tissue was drastically changed and many of the former jobs were eliminated. Furthermore, some of the testimony refers to duties with regard to machines which were replaced prior to the installation of the Multifold. However, at the time of the hearing the jobs were still in existence for special runs of tissues such as those used in doctors' offices, etc.

From the proof offered the duties of the male "Cleaner" job vary considerably based upon the need for building and grounds maintenance, such as grass cutting and spraying the shrubs for insects, which for the most part is done on overtime.

The regular and recurring duties of the *Cleaner* consist of weekly hauling a wagon out to the shipping department or different places in the mill and loading it with four cases of Kleenex tissue, four cases of towels, two cases of Delsey tissue and two cases of Kotex pads and hauling the loaded wagon back to the locker room area; unloading the wagon and carrying full cases up the stairs to the women's and men's locker rooms; hauling trash barrels down the stairs from the women's and men's locker rooms three or four times a shift; picking up cafeteria chairs, putting them on tables and wet mopping the cafeteria, pushing trucks full of trash outside the cafeteria door; periodically spraying and waxing the cafeteria floor and office floors; climbing scaffolds in order to wash high windows and ceilings; and working on heavier jobs on overtime frequently.

The *Locker Room Cleaner* duties consist of lighter type cleaning in the ladies locker room, lounge and washroom; picking up ladies uniforms and putting them in the barrel; picking up waste and refuse; washing and cleaning wash rooms and lounge; putting up supplies; washing walls and windows at floor level; and sweeping the cafeteria. The job involves none of the heavy lifting and hauling aspects of the Cleaner job.

In this case the Secretary of Labor, as plaintiff, has undertaken to prove that jobs which involve different products and which have evolved through labor-management negotiations in different lines of progression, are equal in skill, effort and responsibility under similar working conditions.

The facts of this case must be distinguished from those cases where the jobs were the same, such as Shultz v. First Victoria Nat'l Bank, 420 F.2d 648 (C.A. 5, 1969), wherein the employer was paying the male bank tellers more than female bank tellers and Shultz v. American Can Co., 424 F.2d 356 (C.A. 8, 1970), wherein there were different rates of pay for men and women who operated identical machines on different shifts.

As heretofore noted, the court in Shultz v. Wheaton Glass Co., *supra*, recognized that differences in genuine job classifications were intended to be excepted from the Equal Pay Act of 1963. This is supported by the remarks of Congressman Goodell, the author of the Equal Pay Act, when he said:

"It is our intention, I believe, on both sides of the aisle to provide here with the use of the terms 'effort', 'skill', 'responsibility' and 'working conditions' a maximum area for the interplay of intangible factors that justify a measurement which does not have to be given a point-by-point evaluation. In this concept, we want the private enterprise system, employer and employees and a union, if there is a union, and the employers and employees, if there is not a union, to have a maximum degree of discretion in working out the evaluation of the employee's work and how much he should be paid for it." (109 Cong. Rec. 8686)

"We do not expect the Labor Department people to go into an establishment and attempt to rate jobs that are not equal. We do not want to hear the Department say, 'Well, they amount to the same thing,' and evaluate them so they come up to the same skill or point. We expect this to apply only to jobs that are substantially identical or equal." * * * "It is not intended that the Secretary of Labor or the courts will substitute their judgment for the judgment of the employer and his experts who have established and applied a bona fide job rating system. It is not the business of the Secretary of Labor to write job

evaluations or judge the merits of job evaluation systems." (109 Cong.Rec. 8696, 8698)

In the instant case, upon consideration of the voluminous proof and the observations of the witnesses for the plaintiff, most of whom would be awarded some additional pay for past violations or increased pay if present violations exist, the Court concludes that the plaintiff has not carried his burden of proof as required by the Equal Pay Act.

This Court concludes that all jobs which plaintiff has chosen to compare are equal in skill because the work is capable of being learned by observation and practice without previous specialized education or experience. It is assembly line production skill. In this regard the Court recognizes that individual aptitude makes it easier for some persons to handle small pocket packs of Kleenex tissue than large boxes containing 48 Kotex pads but this is to be distinguished from skill within the meaning of the Act.

With regard to effort the Court concludes that at all times from September 22, 1965, two years prior to the filing of the complaint until the hearing, the former male jobs involved in this suit required more effort than the former female jobs which are alleged to have been equal.

With regard to responsibility the Court concludes that the jobs of Interfolder Operator, Odd-Grade Operator and Reliever in the Kleenex tissue section, which were considerably diminished in use by the installation of the Multifold, are equal to the jobs of packer in the Delsey tissue and napkin section. Otherwise, the proof does not establish that the former female jobs are equal in responsibility with the alleged equal former male jobs.

With regard to the criteria of "similar working conditions", as set forth in the Equal Pay Act, the Court finds from the proof that all jobs involved herein are performed under similar working conditions, except the jobs of Container Sealer Operator Kleenex tissue, Delsey tissue and napkin which are outside the air-conditioned area of the Converting Department (Tr. 1282).

■ The Court therefore concludes that the plaintiff has not proved a violation of the Act because he has not proved that the former female jobs were equal in skill, effort *and* responsibility under similar working conditions as required by the Act.

■ As previously indicated, the employer contended as a defense to this suit that there was no violation because the wage differential was based upon a factor other than sex, namely job content. This is exception (iv) as set forth in the Act and because it is an exception the employer has the burden of proving its applicability. Shultz v. First Victoria Nat'l Bank, *supra,* fn. 8 at page 654. However, upon consideration of the proof in this case the Court concludes that the employer was by this contention merely taking the position that due to the job content the various job classifications were not equal in skill, effort and responsibility. The Court has found that they were not equal; therefore, this Court notes that its ruling is not based upon exception (iv) [5].

For the reasons set forth above the Court concludes that a judgment should be entered for the defendant employer and the unions and the costs should be assessed against the plaintiff.

5. For appropriate example of exception (iv) see Shultz v. First Victoria Nat'l Bank, 420 F.2d 648 (C.A.5, 1969). In that case the employer contended, albeit unsuccessfully, that paying male bank tellers more than female bank tellers was justified on a factor other than sex because the male tellers were in a training program for other jobs, whereas the women were permanent tellers.