James D. HODGSON, Secretary of Labor, United States Department of Labor, Appellant,

v.

SECURITY NATIONAL BANK OF SIOUX CITY, Appellee.

No. 71–1216.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1972.

Decided May 22, 1972.

58

Mack A. Player, Atty., U. S. Dept. of Labor, Washington, D. C., Peter G. Nash, Sol. of Labor, Bessie Margolin, Associate Sol., Carin Ann Clauss, William H. Horkan, Attys., United States Dept. of Labor, Washington, D. C., Harper Barnes, Regional Sol., for appellant.

George F. Davis, Dewie J. Gaul, Sioux City, Iowa, for appellee.

Before MATTHES, Chief Judge, BRIGHT, Circuit Judge, and WEBSTER,* District Judge.

BRIGHT, Circuit Judge.

The Secretary of Labor brought this action for an injunction and other relief against the Security National Bank of Sioux City, Iowa (Bank), to remedy the latter's alleged violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1). The complaint charged the Bank with paying female paying-and-receiving tellers less than men doing equivalent work. The Bank sought to distinguish the male from the female employee by labeling the former "management trainees." The district court, in an unreported opinion, upheld this distinction as a valid exception to the equal pay provisions of the Act, and denied the Secretary any relief. The Secretary promptly appealed. For the reasons stated below, we reverse.

The appellee Bank operates a main office and two branches in Sioux City, Iowa. At the main office, the Bank provides fifteen teller windows for paying-and-receiving purposes. About half of these teller windows had been staffed by men. Between January 1, 1961, and July 12, 1967, the Bank hired forty-nine men and thirty-eight women to work as paying-and-receiving tellers. Until August 3, 1964, the basic starting rate for women ranged between $225 and $275 per month, while men were paid $300 or more per month. From August 3, 1964, to July 12,. 1967, the starting salary for women ranged from $235 to $275 per month, while men were paid $350 or more per month. This difference in salary did not rest upon any difference in job requirements or performance; the Bank stipulated that, during the period here in question, "the work of [its] women employees in the paying-and-receiving teller cages, and the work of [its] male [employees], while working in said paying-and-receiving teller cages, was equal with respect to skill, effort, responsibility, and working conditions." Nor were the salary differences attributable to disparate experience or educational qualifications, since some of the women who the Bank hired at a lower rate possessed more education, and in some instances, more banking experience, than better paid males engaged in the same kind of work.[1]

According to the provisions of the Equal Pay Act,[2] no difference in wage

---

* Sitting by designation.

1. For example, college graduates such as Grace Chaussee (with some banking experience) and Dawn Magnuson (with substantial working experience although not in banking) were hired at $250 per month in July 1963 and April 1964 respectively. In contrast, Douglas Wiggins, with one year of college and no prior banking experience, was hired in February 1963 at $300 per month, and Merle Rost, also with one year of college and only a few months clerical experience in another bank, was hired in August 1963 at $325 per month.

2. The Equal Pay Act amended the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., and reads in pertinent part as follows:

   (d) (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less

rate may exist as between a male and female employee when both perform work "which requires equal skill, effort, and responsibility \* \* \* under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex \* \* \*." 29 U. S.C. § 206(d) (1) (1963). The Bank relies on this last enumerated exception to justify the lower wage rate paid to women tellers.

■ The Secretary of Labor, in defining the scope of the four exceptions to the equal pay provisions of the Equal Pay Act, has specified in an interpretive bulletin that the requirements for an exception are not met "unless the factor of sex provides no part of the basis for the wage differential." 29 C.F.R. 800.142.[3]

We are mindful that interpretive bulletins of a governmental department charged with the administration of a federal law should be given weight and serve as guidance to the courts. *See* Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); United States v. American Trucking Associations, Inc., 310 U.S. 534, 549, 60 S. Ct. 1059, 84 L.Ed. 1345 (1940); and as to the regulations under the Equal Pay Act, Hodgson v. Fairmont Supply Co., 454 F.2d 490, 497–498 (4th Cir. 1972); Schultz v. First Victoria National Bank, 420 F.2d 648, 653 n. 7 (5th Cir. 1969).

■ Both parties to this appeal rely upon provisions of the Secretary's interpretive bulletins. The Bank asserts that its disparate wage treatment between male and female employees is based on a "factor other than sex," within exception (iv) of the Act,[4] since all of the higher paid males working as

than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

\* \* \* \* \*

(3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter.

3. The full text of this general regulation reads as follows:

While differentials in the payment of wages are permitted when it can be shown that they are based on a seniority system, a merit system, a system measuring earnings by quantity or quality of production, or on any other factor other than sex, the *requirements for*

*such an exception are not met unless the factor of sex provides no part of the basis for the wage differential.* If these conditions are met, the fact that application of the system for measuring earnings results in higher average earnings for employees of one sex than for employees of the opposite sex performing equal work would not constitute a prohibited wage differential. However, to come within the exempting provisions, any system or factor of the type described pursuant to which a wage rate differential is paid must be applied equally to men and women whose jobs require equal skill, effort, and responsibility and are performed under similar working conditions. Any evaluation, incentive, or other payment plan which establishes separate and different "male rates" and "female rates" without regard to job content will be carefully examined to determine if these rate differentials are based on sex in violation of the equal pay requirements. (emphasis added)

4. It is well established that the Bank has the burden of proving such an exemption to the general proscriptions of both the Fair Labor Standards Act (FLSA) and the Equal Pay Act (EPA). Schultz v. First Victoria National Bank, *supra,* 420 F.2d at 654 n. 8; *see, e. g.,* Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)

paying-and-receiving tellers allegedly qualified as "officer material" under the management training program. The Bank contends that because women characteristically had been uninterested in management positions, it was unavoidable that only men entered its management training program.

According to testimony of Bank officers, this program contemplated that qualified applicants would train as paying-and-receiving tellers by a systematized rotation among the teller windows, and at the end of eighteen to twenty-four months, might be transferred into other jobs leading to management positions. This program was unwritten until September 1966, eight months after the Labor Department began investigating the Bank.[5]

Against this factual background, the district court made the following determinative findings:

4. Said male employees were employed as management trainees.

5. The management trainees were interested in a career in banking, understood that they were to receive management training and were qualified by reason of experience and education and the training given them substantially followed the program in existence at the Bank.

6. The rotation of the management trainees was clearly distinguishable from the female teller employees.

The court then concluded:

Defendant has established by a preponderance of the evidence that it had a *bona fide* management training program with a differential based on factors other than sex.

■ We must disagree with this determination. In the light of the Secretary's interpretive bulletins and the construction which the courts have given to the Equal Pay Act, the Bank's "management training program" does not fall within an exception to the equal pay provisions of that Act.

A separate interpretive bulletin of the Secretary specifically discusses employee training programs[6] in terms of recog-

---

(FLSA); A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 498, 65 S.Ct. 807, 89 L. Ed. 1095 (1945) (FLSA); Hodgson v. Fairmont Supply Co., *supra*, 454 F.2d at 497; Schultz v. American Can Co.—Dixie Products, 424 F.2d 356, 362 n. 10 (8th Cir. 1970) (EPA).

5. The "management training program" as reduced to writing specified in part the following:

*Training*

The trainee will be placed with a paying & receiving Teller A for a period of two weeks. At the end of this initial period the trainee will be transferred to Paying & Receiving Cage #7 to work as a regular teller for a period of approximately three months under the guidance and assistance of the teller supervisors. At the end of this three month period, the trainee will be transferred to Paying & Receiving Cage #6 to work as a regular teller with limited assistance to see if they are capable of working without close supervision. At the end of this three month period with an accumulated six months experience, the trainee will be transferred to Drive up teller "B" Cage #12 to learn and observe the operation of a drive up teller window. After one to three months, the trainee will be transferred to drive up teller cage #11(A), then to #13(B) and then to #10 drive up Teller "A" classification.

At the end of 18 to 24 months the trainee will have first hand experience at several teller jobs and at the same time will have observed the work of the Proof & Transit Dept. in processing checks cashed and deposits received. The trainee should have a working knowledge of computer processing and of demand deposits also at this time.

After completion of the teller training portion of this program, the trainee will then be transferred to one of the other departments of the bank, such as the Installment Loan Dept., New Accounts Dept., Computer Dept. or Real Estate Dept. The basis of these promotions are all on a merit basis and not that of seniority.

＊　　＊　　＊　　＊　　＊

It is the purpose of this program to improve the quality and experience of the future officers and management personnel of the bank.

6. Employees employed under a bona fide training program may, in the furtherance

nizing the validity of an inequality in wage rates between the sexes for equal work on a *temporary* basis while trainees gain experience in various types of work within an employer's establishment. The bulletin very clearly advises that training programs appearing to be "available only to employees of one sex will, however, be carefully examined to determine whether such programs are in fact bona fide." Moreover, in an establishment where a differential has been paid to employees of one sex because "traditionally, only they have been considered eligible for promotion to executive positions," that practice represents a discrimination based on sex in violation of the Act, in the absence of a bona fide training program. 29 C.F.R. 800.-148.

The Secretary contends that the Bank's "training program" does not qualify as a "bona fide training program" and, in any event, the exception is inapplicable because only men were traditionally considered promotable to executive positions. The Secretary argues that the trial court gave no analysis to the underlying facts in reaching a conclusion contrary to the Secretary's position.

We turn, therefore, to a consideration of the "training program." The underlying facts reveal that in most instances, male employees were unaware that any training program existed. In certain instances where "training" was mentioned,

the male applicant received only assurances of advancement, as a hope for the future, provided "everything worked out." In almost every instance when the Bank wrote for recommendations concerning a prospective male employee, the Bank made reference to the proposed employment as that of teller. The "trainees" did not rotate through various departments of the Bank in order to acquire detailed knowledge and comprehension of the Bank's whole operation, but rather, the rotation was confined to various paying-and-receiving windows. None of the male employees during the period here in question followed the specific rotation of the Bank's written management training program. The female tellers, too, followed a random rotation among the various paying-and-receiving windows. The rotation of male, as well as female, personnel appears to have been geared to the personnel needs of the Bank, and not to training requirements.

Additionally, and most importantly, no woman ever qualified as a management trainee. Several of the women employees working as tellers possessed college backgrounds and extensive working experience, which clearly should have qualified them for the same employment status as men with similar backgrounds who were working at paying-and-receiving windows. Yet, only men received the better wage as "management trainees." [7]

---

of their training, be assigned from time to time to various types of work in the establishment. At such times, the employee in training status may be performing equal work with nontrainees of the opposite sex whose wages or wage rates may be unequal to those of the trainee. Under these circumstances, provided the rate paid to the employee in training status is paid, regardless of sex, under the training program, the differential can be shown to be attributable to a factor other than sex and no violation of the equal pay standard will result. Training programs which appear to be available only to employees of one sex will, however, be carefully examined to determine whether such programs are, in fact, bona fide. In an es-

tablishment where a differential is paid to employees of one sex because, traditionally, only they have been considered eligible for promotion to executive positions, such a practice, in the absence of a bona fide training program, would be a discrimination based on sex and result in a violation of the equal pay provisions, if the equal pay standard otherwise applies.

7. The Bank included as a qualified trainee one former "fry cook" with one year of business school; a high school graduate who had farmed and done clerical work; and other males who did not appear to meet the educational or experience requirements specified for trainees in the written program.

Although the vice-president of the Bank testified that the management training program was open to both sexes, the Bank produced no testimony showing that it had ever offered management training to any woman. Its officers explained that females, who may have possessed college training and satisfactory prior working experience, were not considered for management training because of pregnancy or transfer of their husbands outside of the Sioux City area. These officers had commented to an investigator for the Labor Department that men possessed a greater potential for service to the Bank. In sum, the Bank claimed that, because of their sex or marriage status, none of the female employees hired during the period in question offered any potential for long-term employment. Thus, the Bank felt justified in soliciting and hiring women as tellers at a rate lower than men who did the very same work but carried the title of "management trainees."

The Bank's explanation for its disparate treatment of male and female employees falls far short of the requisite legal justification to relieve it of the obligation to pay men and women equally when doing equivalent work. The Fifth Circuit, in considering an almost identical factual situation, determined a management training program to be inadequate to justify a higher wage being paid to male "management trainees" than females when both actually worked as bank tellers. Schultz v. First Victoria National Bank, *supra*, 420 F.2d 648 (5th Cir. 1969).

In *First Victoria National Bank*, the training program "consisted of little more than the recognition of the ability of employees to work their way up the ranks * * * [although it] was supposed to provide rotation for the 'trainee' through the various departments of the bank so [that] the employee would more fully comprehend the banks' operations." *Id*. at 654. The court added:

Such rotation of the male "trainees" was, however, not distinguishable from the normal course of employment for the female employees * * *. The time spent in each department varied widely and was in fact based not upon any concept of training but upon the bank's personnel needs. [*Id*. at 655]

* * * * * *

These vague, almost illusory, training programs that were applied in a discriminatory manner may have been "a better reason" than the maleness or femaleness of employees for the inequality in pay. But, they were not "factors other than sex" within the meaning of the Equal Pay Act. [*Id*. at 659]

The Fourth Circuit recently considered and rejected a similar "management-training program of an employer seeking to justify similarly disparate wage treatment between the sexes. Hodgson v. Fairmont Supply, *supra*, 454 F.2d 490. There, the employer paid two female stock clerks less than their male counterpart who had purportedly been hired as a "sales trainee." After determining that the tasks performed by these employees were equivalent, the court then turned to an analysis of the training program as explained by the employer,[8] and characterized this pro-

---

8. The employer testified in part as follows:
Q. " * * * What is your training program? * * *
A. Well, each person will probably have a different training program depending upon what we expect to use them for. * * *
　　* 　　* 　　* 　　* 　　*
Q. And this consists largely of just working and learning the workings of your company, is that not true?

A. Right, yes, ma'am."
Q. " * * * Well, is it a specifically designed program with certain limits—certain periods?
A. We—again, when we hire somebody and specifically for a job like this, we start men in the same direction and then we hit a certain point where they begin to branch off where their particular qualifications lead them. So these programs that we have set up are such that again

gram as "nothing more than the process by which one might work his way up in the company." Further, after noting that the sales training program was sex oriented and not made available to women, the court concluded:

We cannot accept a training program co-terminous with a stereotyped province called "man's work" as a factor other than sex. [*Id.* at 498]

Similarly here, the Bank's explanation for the absence of women in the ranks of its management trainees recites a preconceived and traditional notion that women, because of their principal roles as wives and mothers, must occupy an employment status second to men outside the home. This notion is outmoded as well as unfair.[9]

■ In Schultz v. American Can Co.—Dixie Products, *supra,* 424 F.2d 356, we quoted the following statement from Schultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir. 1970):

The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it. [424 F.2d at 360]

In light of this enunciation of the clear purpose of the Equal Pay Act, the rationalizations offered by the Bank for the wage disparity between men and women working as tellers cannot stand. We hold its conduct to be illegal in this regard. *See, e. g.,* Hodgson v. Fairmont Supply Co., *supra,* 454 F.2d 490; Schultz v. Wheaton Glass Co., *supra,* 421 F.2d 259; Schultz v. First Victoria National Bank, *supra,* 420 F.2d 648. Accordingly, we reverse and remand this case to the district court and direct that it enter an appropriate injunctive order and make appropriate back-pay awards.[10]

if we were hiring somebody for purchasing it would depend on—I mean for the purchasing job, it would depend again on what his background was, what his training had been prior, and so forth, as to what training we would give him."

Q. " * * * Is it your [Mr. Mason's] understanding you're still in the program?

A. Certainly. You're always in a training program as far as that goes."

[454 F.2d at 498]

9. President Kennedy, in signing the Equal Pay Act, summarized the conditions which necessitated this law as follows:

[T]he average women worker earns only 60 percent of the average wage for men * * * Our economy today depends upon women in the labor force. One out of three workers is a woman. Today, there are almost 25 million women employed, and their number is rising faster than the number of men in the labor force. It is extremely important that adequate provision be made for reasonable levels of income to them, for the care of the children * * * and for the protection of the family unit * * * Today one out of five

of these working mothers has children under three. Two out of five have children of school age. Among the remainder, about 50 percent have husbands who earn less than $5,000 a year —many of them much less. I believe they bear the heaviest burden of any group in our nation [Remarks of the President at signing the Equal Pay Act on June 10, 1963, XXI Cong.Q. No. 24, p. 978 (June 14, 1963).]

10. The record indicates that after July 1967, the Bank began hiring male tellers at the same starting rate that it was paying female tellers. The Secretary claims that these male employees are also entitled to back-pay awards. The statute prohibits an employer who is in violation of the sex discrimination provisions of the Act from obtaining compliance by reducing the wage rate of male employees. 29 U.S.C. § 206(d) (1). The lower rate must be increased to the higher. Schultz v. American Can Co.—Dixie Products, *supra,* 424 F.2d at 359. This issue remains for exploration by the district court on remand.