Christine HERMAN et al., Plaintiffs,

v.

ROOSEVELT FEDERAL SAVINGS & LOAN ASSOCIATION, Defendant.

No. 75–967C(3).

United States District Court, E. D. Missouri, E. D.

May 11, 1977.

Lisa A. Van Amburg, Anderson, Sedey & Van Amburg, St. Louis, Mo., for plaintiffs.

John B. Lewis, Millar, Schaefer & Ebling, St. Louis, Mo., for defendant.

## MEMORANDUM

WANGELIN, District Judge.

This is an action under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. (the "Act"). Plaintiffs are four past and present female employees of defendant. They seek to recover back-pay allegedly withheld in violation of 29 U.S.C. § 206(d)(1). That section provides in part:

> No employer . . . shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to . . .; (ii) a merit system; . . . or (iv) a differential based on any other factor other than sex . . ..

The action involves plaintiff's performance in four "job categories": teller, teller-counselor, assistant head teller, and savings supervisor.

The Court has jurisdiction over this matter pursuant to 29 U.S.C. § 217. The Court heard evidence sitting without a jury. After considering the credible testimony and reviewing the entire record, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Defendant is a federally chartered savings and loan association doing business within this district.

2. At all times since November 1, 1972, the activities of defendant have been related and performed through unified operation and common control for a common business purpose.

3. At all times since November 1, 1972, defendant has had an annual gross volume of sales made or business done of not less than $250,000.00.

4. Defendant maintains its business headquarters in a single facility located in downtown St. Louis, Missouri, (the "downtown facility"). Certain management and all personnel functions are centralized at the downtown facility, including defendant's accounting, finance, loan, and employee payroll departments. Defendant's central management is responsible for the ultimate review and approval of all proposals for employees' salary increases. Defendant's formal employee training programs are conducted centrally at the downtown facility.

5. The central personnel department, headed by the personnel director, is located at the downtown facility. The personnel director coordinates and administers defendant's compensation policies and procedures, training programs, employee performance appraisal programs, and salary review programs. He is responsible for hiring and setting the starting salaries of all tellers and teller-counselors.

6. Tellers employed by defendant handle a variety of "counter" transactions with customers. These transactions include deposits, withdrawals, check cashing, and selling money orders, travelers checks, and bonds. They are required to organize, handle, and balance a cash drawer and operate a computer terminal. All tellers employed by defendant perform substantially identical job duties.

7. The so-called teller duties are also performed by teller-counselors. In addition to the teller duties, the teller-counselors advise customers with regard to the various savings accounts and certificates that are available for depositors. Because these various savings methods yield different returns and have different features, the teller-coun-selor is expected to counsel customers as to which method best suits their particular needs.

8. A majority of the job duties and responsibilities actually performed by all teller-counselors employed within defendant's establishment are substantially similar, if not identical. Because there is no substantial differentiation of job duties among teller-counselors, the amount of skill, effort, and responsibility required for performance of the job teller-counselor must be deemed substantially similar for all teller-counselors employed at defendant's establishment.

9. Assistant head teller is a position occupied by no more than a single employee at defendant's establishment. The specific duties performed by the assistant head teller are substantially similar to those performed by a teller, except that the assistant head teller is responsible for occasional supervision of other employees. These supervisory duties require some additional skills and the assistant head teller must assume greater responsibilities than other tellers.

10. Savings supervisors employed by defendant supervise both tellers and teller-counselors. The basic skills required for performance of the job are a knowledge and ability to perform the teller-counselor functions and an ability to supervise employees. The amount of skill, effort and responsibility required for performance of the job, savings supervisor, must be deemed and in fact is substantially similar for all savings supervisors employed by defendant.

11. Defendant maintains approximately 18 facilities in the St. Louis metropolitan area. The working conditions for tellers, teller-counselors and assistant head tellers are essentially the same at each facility. While the size of the various facilities may differ, each is an office at which defendant's savings and loan business is conducted. Defendant's employees are transferred freely and frequently among the facilities, without requiring additional training or other preparation. Defendant does not alter the compensation of the employees who are transferred.

12. The jobs, teller and teller-counselor, involve different kinds and amounts of skill, effort and responsibility. A mistake made by a teller-counselor is likely to have a greater financial impact on defendant than one made by a teller. The two jobs cannot be treated as equal under the provisions of the Act. Because of the supervisory duties involved the jobs of savings supervisor and assistant head teller must also be considered separate from the jobs of teller and teller-counselor and from each other.

13. Plaintiff Christine Herman was hired by defendant on April 15, 1975, to work as a teller-counselor. Her starting salary was $450.00 per month. She completed approximately one month of training at defendant's downtown facility for her job as teller-counselor. She was then transferred to defendant's Crestwood facility. On December 8, 1975, she was transferred to defendant's Chesterfield facility. Plaintiff Herman's salary was raised on January 1, 1976, to $490.00 per month. On August 31, 1976, she terminated her employment at defendant's establishment.

14. When plaintiff Herman was hired by defendant in April, 1975, she possessed a high school diploma and a bachelor's degree in anthropology. She had no employment experience relevant to her work at defendant's establishment.

15. Plaintiff Robin Young was hired by defendant on August 27, 1973, as a teller-counselor. Her starting salary was $475.00 per month. She completed approximately two months of training at defendant's downtown facility. She was then transferred to defendant's Northwest Plaza facility. On January 1, 1974, her salary was raised to $500.00 per month. On May 4, 1974, she took a leave of absence from her job as teller-counselor. On June 6, 1974, she returned to her job as teller-counselor at defendant's establishment, at which time her salary remained at $500.00 per month. She was assigned to work at defendant's Clayton facility. Her salary was subsequently raised on October 1, 1974 to $550.00 per month and on January 1, 1975 to $625.00 per month.

16. When plaintiff Young was hired by defendant in August of 1973, she possessed a high school diploma and a bachelor's degree in fine arts. She had four summers of employment experience in general office work, including typing, telex, telephone work, and customer relations.

17. On February 7, 1975, plaintiff Young was promoted to the position of savings supervisor. Her starting salary was $625.00 per month. Her salary was raised on July 1, 1975 to $650.00 per month. On January 28, 1976, she terminated her employment with defendant.

18. Plaintiff Nanette Manlove was hired by defendant on April 15, 1974, as a temporary employee. On May 16, 1974, she began working as a full-time teller. Her starting salary as a full-time teller was $375.00 per month. She completed training for her work as a teller at the downtown facility. On July 30, 1974, she was transferred to defendant's Kirkwood facility where she worked three or four weeks as a full-time teller. She then received training for work as a teller-counselor.

19. When plaintiff Manlove was hired by defendant, she possessed a high school diploma. She had no employment experience relevant to her work at defendant's establishment.

20. On August 21, 1974, plaintiff Manlove began working as a full-time teller-counselor at $375.00 per month. Her salary was raised on October 1, 1974 to $400.00 per month, on January 1, 1975 to $450.00 per month, on January 1, 1976 to $515.00 per month, and finally, on April 1, 1976 to $540.00 per month. In August of 1975 she was transferred to defendant's Crestwood facility. Plaintiff Manlove is currently employed by defendant as a teller-counselor.

21. Plaintiff Janet Wendel was hired by defendant on January 17, 1972 as a teller. Her starting salary was $350.00 per month. She completed training for her work as a teller at the downtown facility. Her salary was raised on April 15, 1972 to $375.00 per month, and on January 1, 1973 to $425.00 per month.

22. On November 20, 1973, plaintiff Wendel was named assistant head teller at $425.00 per month. Her salary was raised on January 1, 1974 to $470.00 per month.

23. On August 1, 1975, plaintiff Wendel began working as a full-time teller-counselor. Her salary was raised on January 1, 1976 to $596.00 per month. On July 30, 1976, she terminated her employment with defendant.

24. When plaintiff Wendel was hired by defendant in January of 1972, she possessed a high school diploma and she had completed one year at St. Louis Business College. She had no employment experience relevant to her work at defendant's establishment.

25. Certain male teller-counselors were paid more than female tellers and teller-counselors by reason of their designation as pool tellers. The job classification is alleged to justify the higher salaries of pool tellers as a "factor" other than sex. Pool tellers are asked to travel, on short notice, to particular facilities within defendant's establishment which require additional assistance on a temporary basis. On arrival at an assigned facility, pool tellers perform the normal job duties of teller-counselors. Thus, the only job duty which differentiates pool tellers from teller-counselors is assignment flexibility. To the extent that the disparity in pay between females and males was due to an employee's assignment as a pool teller, the payments were discriminatory. Pool tellers either received an increased in salary or received the same salary when their pool duties ceased. The "pool premium" was not dropped.

26. To some degree defendant based the starting salaries of its employees on their education, experience and ability to communicate with other people. The experience and education considered did not completely correlate, however, to the job skills required of tellers and teller-counselors. The system of paying higher salaries to those with more education and experience was not applied consistently and was not applied without regard to sex.

27. Defendant operated an informal management training program from early 1973 to approximately March of 1976 when defendant's separate branch management training program took effect. In late 1973, the basic goals of defendant's management training program were set out in a written rough outline by defendant's personnel director. The program's basic concept and its application remained the same throughout its length of operation at defendant's establishment. The trainees were intended to acquire knowledge of defendant's operation by rotating through various jobs within defendant's establishment. Theoretically, once trained, these employees would be promoted into management positions.

28. Defendant's management training program primarily consisted of designating certain individuals as employees to "watch" or "keep an eye on". The employees chosen were assumed to have the potential to progress up through the ranks of employment at defendant's establishment. Defendant informally specified certain positions or departments through which the trainees might be rotated. The specific jobs occupied by the trainees in their length of assignment was dependent entirely upon defendant's needs. For the most part, the trainees performed the jobs of teller-counselors. Some performed insignificant additional duties. The program did not have an established termination date nor did defendant maintain any established programs of instruction.

29. Defendant's annual merit review (AMR) system was in effect in 1972 and throughout 1974. Under this system employees were given a written evaluation by January of each year. The evaluation consisted of the completion of AMR forms by any or all of their supervisors of the preceding year. Annual salary increases were recommended by the employees' division head. They were based upon the completed AMR forms and the conversations with the supervisors who had completed them. The supervisors were given no written guidelines concerning evaluation procedures other than the form itself. Training in the use of the form was conducted, however. Salary increase recommendations were based for the most part on the AMR forms.

30. From January of 1975 to the present, defendant has had in effect its performance review and analysis system. The basic component of the system is the performance evaluation summary form (PES). Under this system, defendant's branch managers complete the evaluation procedures in December of each year or the following January. Once the PES form is completed the branch manager computes the amount of an employee's annual salary increase by using a three-page form. On the first page, the branch manager completes a graph on which he numerically ranks all of his employees. The ranks are then added together and their total is divided into the total amount of money available to the branch manager for salary increases. The resulting factor is then individually multiplied by each employee's rank number. In each case the result is considered the total potential amount available to increase that particular employee's salary. The second page of the system also requires the listing of the employees in rank order. Their current salaries are plotted on the graph opposite their names. The branch manager then considers the adoption of the proposed minimum wage increase available to that employee, as computed on the immediately preceding page. The determination of the ultimate amount of each employee's salary increase is then left to the judgment of the branch manager.

31. Salary increases for individual employees are also granted outside defendant's annual merit review period. Prior to January, 1974, branch managers submitted a memo requesting such increases to their division head. Defendant did not maintain a set form for such requests. After January of 1974, the same procedures were followed for interim salary increases except that defendant utilized a standard salary adjustment request form. In using the form, branch managers were expected to complete a three-line section labeled "reason for adjustment".

32. Defendant's salary increase plan was an established plan ¬ith objective criteria. Although it involved the exercise of subjective judgment by supervisors, it was applied without regard to sex.

33. Defendant was aware of the operation of the equal pay provisions of the Fair Labor Standards Act nearly from the time of their enactment. It did not take steps to determine if its salary policy was in compliance with the Act but rather relied on a good faith belief that it was.

34. The difference between the average monthly starting salary of men and women as tellers, teller-counselors, assistant head tellers and savings supervisors for each year from 1972 to 1975 is set out as an appendix to this memorandum opinion. It is incorporated as a part of the Court's findings of facts.

### Conclusions of Law

This suit is essentially four separate actions. Each plaintiff is attempting to show that she received a starting salary lower than male employees doing the same work, and that this disparity was maintained through discriminatory salary increases. The ultimate question in this suit is what group of male employees should be considered as comparable to plaintiffs within the terms of the Act.

Plaintiffs have offered the Court a statistical compilation that treats tellers, assistant head tellers, pool tellers and teller-counselors the same. The resulting figures show a gross difference between male and female salaries. Defendant urges that plaintiffs have compared themselves with male employees who either did not perform "equal work" or who are entitled to receive a higher salary because of a "factor other than sex." Defendant has offered its own salary comparison that takes these theories into account and shows nearly equal pay for male and females.

■ The Act imposes the initial burden of showing discrimination upon plaintiffs. Once such a showing is made the burden shifts to defendant to prove a defense. Plaintiffs sought in part to meet their burden by showing that the positions of teller, teller-counselor, assistant head teller and

pool teller require equal work. In this respect they have failed, at least partially, to meet their burden.

◼ The Court is mindful that the equal work requirements of the Fair Labor Standards Act must be reasonably construed. Congress in prescribing "equal" work did not require that the jobs be identical, but only that they must be substantially equal. Any other interpretation would destroy the remedial purposes of the Act.

\* \* \* \* \* \*

Differences in job classifications were in general expected to be beyond the coverage of the Equal Pay Act. This was because in the case of genuine job classifications the differences in work necessarily would be substantial and the differences in compensation therefore would be based on the differences in work which justified them. Congress never intended, however, that an artificially created job classification which did not substantially differ from the genuine one could provide an escape for an employer from the operation of the Equal Pay Act. This would be too wide a door through which the content of the Act would disappear. (footnotes omitted). *Shultz v. Wheaton Glass Co.,* 421 F.2d 259, 265–266 (3rd Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

◼ The evidence showed that each job had some duties different from the others. Some of these duties were not substantial but when the jobs are viewed as a whole they cannot be deemed equal. The different levels in skill and responsibility certainly justify differences in compensation. However, under the Court's findings of fact this conclusion cannot extend to the job of pool teller. Defendant claims that certain male employees were paid higher wages for performing teller-counselor duties because of the "flexibility" involved. That claim is not consistent with defendant's payment of the same or higher wages to those employees after their pool duties were terminated.

◼ This conclusion does not end the Court's inquiry, however. Even comparing men and women within these four job categories (teller, assistant head teller, teller-counselor and savings supervisor) there existed a substantial disparity in pay. This makes a prima facie showing[1] of a violation of the Act and shifts the burden to defendant to explain its conduct.

### Starting Salaries

#### A. Management Training Program.

◼ Defendant argues that it is entitled to pay certain male employees, most of whom were teller-counselors, higher wages because of their participation in a management training program. It is recognized that under certain circumstances a bona fide training program may be a defense to an equal pay claim. *Hodgson v. Security National Bank of Sioux City,* 460 F.2d 57 (8th Cir. 1972). Employers may rotate trainees through various jobs where they "learn the business" and pay them more than others permanently assigned to those same jobs. Cases discussing training programs have established various factors relevant to the evaluation of such plans. See *Shultz v. First Victoria National Bank,* 420 F.2d 648 (5th Cir. 1969); *Shultz v. American Can Company-Dixie Products,* 424 F.2d 356 (8th Cir. 1970); *Hodgson v. Security National Bank of Sioux City, supra; Hodgson v. Behrens Drug Co.,* 475 F.2d 1041 (5th Cir. 1973). A training program must be structured to some degree. *Shultz v. American Can Company-Dixie Products,* 424 F.2d at 362. Transfers should be made pursuant to the training program and not just to fill the immediate needs of the employer. *Hodgson v. Security National Bank of Sioux City,* 460 F.2d at 61. Finally, the program must be open to both sexes or it will be subject to close scrutiny. *Hodgson v. Security National Bank of Sioux City, supra.*

---

1. As explained in the appendix, plaintiff Janet Wendel has not made a prima facie showing of a violation of the Equal Pay Act.

■ When viewed in light of these factors defendant's training program cannot be considered as causing a "differential based on a factor other than sex." Defendant's trainees were almost exclusively male. They did the work of teller-counselors and were transferred at defendant's need and not pursuant to any plan of rotation. Under similar circumstances, training programs have not been considered proper defenses.

## B.   Education and Experience.

■ It is clear that an employer may pay a higher starting salary to one who has education or experience relevant to the job to be performed. Defendant's evidence tended to show that those persons with business related college degrees can better understand certain concepts necessary to the teller-counselor job. Plaintiffs' evidence tended to show that understanding these concepts is only a minor part of teller-counselor training and work. This Court does not wish to dictate to defendant what college courses it should consider as "job related" and what monetary value it should give them. The Court takes notice of the fact that as a general rule an employer in the banking business will find employees with more education and experience more attractive.

■ However, defendant has not met its burden of showing that the salaries were in fact based upon the applicants education and experience[2] or that the standards, if any, were consistently applied to both sexes. *Brennan v. Victoria Bank & Trust Co.,* 493 F.2d 896 (5th Cir. 1974). Thus, this factor cannot serve as a defense and the Court must conclude that defendant violated the Act in setting plaintiffs' initial salaries.

## Salary Increases

■ A comparison of salary increases for the several years involved shows the defendant's male employees generally received larger raises than female employees. The Court heard extensive testimony concerning defendant's system of "merit increases". There was ample testimony to support a finding that the increases were based upon the employees' performance. It must be concluded that defendant employed a bona fide merit program within the meaning of the Act.[3]

## Back-Pay Awards

Having considered all these factors the Court must conclude that defendant has violated 29 U.S.C. § 206(d). The only question remaining is the amount of damages due.

■ Plaintiffs have asked for recovery of back-wages from October of 1972. Actions under the Fair Labor Standards Act for unpaid minimum wages (which includes Equal Pay cases) must be brought within two years of any violation unless the violation is "wilful". 29 U.S.C. § 255(a). Actions for wilful violations may be brought within three years. This suit was filed on October 29, 1975. "Wilful" is construed to include violations made in good faith if the employer is aware of the application of the Act. *Brennan v. J. M. Fields,* 488 F.2d 443 (5th Cir. 1973), *cert. denied* 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974). Thus, the circumstances of this case require the application of the three year period.

One other adjustment to the damage award is required. The Court found that defendant's practice of basing salaries on education and experience was not applied equally to both sexes and could not serve as a defense. However, as stated before, the

2.  It should be noted in passing that in most cases the women employees came to defendant with more job experience than their male counterparts. The males tended to have more education.

3.  Plaintiffs' primary objection to the system was that the review forms used to evaluate personnel were not binding upon the personnel director. It is clear from the evidence that the only adjustments made were intended to keep employees within a certain salary range. This system did not operate to lower the raises of plaintiffs who were already making less than their male counterparts. Thus, at least to them, the merit system had no adverse impact.

Court believes that those factors may legitimately be considered in determining wages. The Court has adjusted the back-pay awards of plaintiff Manlove to reflect the fact that she had neither a college degree nor any job experience.

Finally, the terms of the Act provide that the Court shall award attorneys' fees and costs to plaintiffs.[4] 29 U.S.C. § 216(b). In view of the finding that defendant acted in good faith, no liquidated damages shall be awarded.

## APPENDIX

The following figures are based on a comparison of male and female employees' starting salaries at the position of teller counselor and savings supervisor. No male employees started as tellers with plaintiff Janet Wendel and her starting salary as a teller-counselor in 1975 was higher than that paid to males. Also, her position as assistant head teller was unique in defendant's establishment and thus may not be compared to any male employees. Thus, plaintiff Wendel has not made a case and judgment will be granted for defendant against her. An adjustment has been made to plaintiff Nanette Manlove's recovery to reflect her educational background. Her salary was compared to males with similar backgrounds. The final figures reflect the Court's finding that defendant did not discriminate with respect to salary increases, only initial salary levels.

### Starting Salaries
### Per month

| Year | Position | Plaintiff | Average Male | Unpaid Minimum Wages Damages |
|---|---|---|---|---|
| 1972 | Teller | Janet Wendel $350 | ____ | $0 |
| 1973 | Teller-Counselor | Robin Nichols $475 | $655 | $180 |
| 1974 | Teller-Counselor | Nanette Manlove $375 | $475 * | $100 |
| 1975 | Teller-Counselor | Christine Herman $450 | $524 | $ 74 |
| | | Janet Wendel $546 | $524 | $0 |
| 1975 | Savings Supervisor | Robin Nichols $625 | $700 | $ 75 |

* The average male starting in 1974 as a teller-counselor was paid $575 per month. However, those without college degrees or experience (plaintiff Manlove had neither) started at $475.

### Total Damages *

| Plaintiff | Position | Amount Due | Months Worked | Total |
|---|---|---|---|---|
| Robin Nichols | Teller-Counselor | $180 | 16 | $2,880.00 |
| Nanette Manlove | Teller-Counselor | $100 | 36 | $3,600.00 |
| Christine Herman | Teller-Counselor | $ 74 | 17 | $1,258.00 |
| Robin Nichols | Savings Supervisor | $ 75 | 12 | $ 900.00 |
| | | | | $8,638.00 |

* The Court recognizes that the salary increases received by plaintiffs might not have been as high had they received higher salaries initially. However, it would involve mere speculation to try to adjust the back-pay awards for that possibility.

4. The Court believes that in light of the discussion in *Peltier v. City of Fargo,* 533 F.2d 374 (8th Cir. 1976) an award of $5,500.00 for attorneys' fees is reasonable. That amount will be added to the judgment. In awarding this amount the Court considered the fact that only three of four plaintiffs prevailed.