EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Appellant,

v.

UNIVERSAL UNDERWRITERS INSUR-
ANCE COMPANY, a corporation; E. M.
Lynn, d/b/a Lynn Insurance Group, Ap-
pellees.

No. 80–1968.

United States Court of Appeals,
Eighth Circuit.

Submitted April 17, 1981.

Decided July 24, 1981.

LeRoy D. Clark, Gen. Counsel, Constance
L. Dupre, Acting Associate Gen. Counsel,
Vella M. Fink, Acting Asst. Gen. Counsel,
William H. Ng, Colleen M. O'Connor, ar-
gued, Attys., E.E.O.C., Washington, D. C.,
for appellant.

William H. Sanders, argued, John R. Phil-
lips, D. Brook Bartlett, Blackwell Sanders

Matheny Weary & Lombardi, Kansas City, Mo., for Universal Underwriters Ins. Co.

Before LAY, Chief Judge, GIBSON, Senior Circuit Judge, and BRIGHT, Circuit Judge.

BRIGHT, Circuit Judge.

The Equal Employment Opportunity Commission (EEOC or Commission) brought this action in federal district court against the Universal Underwriters Insurance Company (UUIC or Company), alleging a violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1976).[1] The EEOC asserted that, although male supervisory trainees and female Internal Services Department clerks performed substantially equal work, the Company paid lower wages to the female clerks.

After extensive discovery and three days of trial, the district court[2] made detailed findings of fact and entered judgment in favor of the Company. In essence, the court found that the functions performed by the supervisory trainees required greater skill, effort, and responsibility than the work performed by the clerks in the Internal Services Department. The court also concluded that, even assuming the supervisory trainees and clerks performed substantially equal work for unequal pay, the Company's training program constituted a "factor other than sex," a lawful basis for the wage differential under 29 U.S.C. § 206(d)(1)(iv).[3]

On appeal, the EEOC challenges these findings as clearly erroneous and contrary to law. After carefully reviewing the record, we conclude that the work performed by the supervisory trainees required greater skill, effort, and responsibility than that performed by the clerks in the Internal Services Department. We, therefore, affirm the district court's judgment in favor of UUIC.

I. *Background.*

UUIC, a nationwide insurance company, principally writes policies for factory-franchised new car dealers and motorcycle operators. In the late 1960's and early 1970's, UUIC's business in these areas grew substantially. From 1967 to 1972, the Company nearly doubled its insurance volume and became the largest writer of automobile agency insurance in the nation. Also, during this period, UUIC developed a computerized system for producing insurance policies. To implement this system, the Company established eleven new regional offices throughout the country and extensively reorganized the Internal Services Department in its home office.

---

1. The Secretary of Labor originally filed this action in 1975, naming UUIC, Epperson Underwriting Company, Lumbermen's Underwriting Alliance, and E. M. Lynn, d/b/a Lynn Insurance Group, as party-defendants. In 1979, however, the EEOC assumed the Secretary's role as plaintiff after Congress and the President transferred enforcement of the Equal Pay Act from the Department of Labor to the Commission. See Reorganization Plan No. 1 of 1978, 43 Fed.Reg. 19,807 (1978); Exec. Order No. 12,144, 44 Fed.Reg. 37,193 (1979). Subsequently, the Commission stipulated to the dismissal of Epperson Underwriting Company and Lumbermen's Underwriting Alliance as defendants. *See* Amended Standard Pre-Trial Order No. 2 Including Stipulation of Uncontroverted Facts, *Marshall v. Underwriters Insurance Co.,* Civ. No. 75CV 161–W–B (W.D.Mo. June 12, 1979).

2. The Honorable William R. Collinson, United States District Judge for the Western District of Missouri.

3. Under the Equal Pay Act, an employer cannot pay male and female employees at different wage rates for substantially equal work,

> except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex * * *. [29 U.S.C. § 206(d)(1) (1976).]

Once a plaintiff establishes that an employer has compensated male and female employees at unequal rates for substantially equal work, the employer must demonstrate that one of the four § 206(d)(1) exceptions apply. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195–97, 94 S.Ct. 2223, 2228–29, 41 L.Ed.2d 1 (1974); *Strecker v. Grand Forks Social Service Board,* 640 F.2d 96, 99 n. 1 (8th Cir. 1981) (en banc); *Horner v. Mary Institute,* 613 F.2d 706, 713 (8th Cir. 1980).

As a result of the Company's rapid growth, computerization, and reorganization, management officials determined that UUIC had an immediate need for additional supervisors in the Internal Services Department.[4] In 1967, therefore, UUIC developed and implemented a management training program.[5]

After implementation of the training program, two tracks existed for advancement toward supervisory positions in the Internal Services Department: (1) a "traditional track," in which employees assumed entry-level positions as grade V clerks and became eligible for a managerial position upon attaining the grade IX level; and (2) a "fast track," in which employees directly achieved supervisory positions after successfully completing the Company's two-year management training program.

Virtually all of the clerks in the Internal Services Department were female; all but one of the thirty participants in the management training program were male. The EEOC charges that, irrespective of the difference in their job titles, the female clerks and the male supervisory trainees performed substantially equal work; thus, the Company's payment of lower wages to the female clerks constitutes discrimination on the basis of sex.

## II. *Discussion.*

To establish a violation of the Equal Pay Act, the EEOC must demonstrate that an employer compensated employees of one sex at a lower rate than it paid to employees of the opposite sex for "equal work on jobs the performance of which requires equal skill, effort, and responsibility" under similar working conditions. 29 U.S.C. § 206(d)(1) (1976).

Whether two jobs entail equal skill, equal effort, or equal responsibility requires a practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job. Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job. In all cases, therefore, a court must compare the jobs in question in light of the full factual situation and the broad remedial purpose of the statute. *See* 29 C.F.R. §§ 800.114–.132 (1980).

In the present case, the district court compared the supervisory trainee and clerk positions and, among other differences, found:

> 26. Qualifications to be hired in the starting nonsupervisory Internal Services position were as follows: high school diploma, typing at 40 wpm, mathematical ability, coding ability, data perception, and writing ability.

> \*   \*   \*   \*   \*   \*

> 28. The necessary qualifications needed by persons to be selected for the supervisor training program were clearly defined and reduced to writing in 1970 as follows:

>> (d) that the salary structure of the Internal Services Department was competitive with the salary structure of like businesses;
>> (e) that such a salary structure did not generally attract people with high managerial potential and attracted virtually no males.
>> 4. The goal of the supervisor's training program was to train individuals who were capable of becoming supervisors and assuming responsibility quickly.

4. According to the district court's findings,

> 3. \* \* \* UUIC initiated a supervisor's training program because it determined:
> (a) that its traditional concept of developing managers from within would not satisfy its increasing needs for managers who could understand and advance in a new technological environment;
> (b) that the clerks working in the Internal Services Department had little business experience and little or no educational background beyond high school;
> (c) that most of the clerks evidenced a lack of present or potential managerial and supervisory skills;

5. In 1970, the Company expanded the training program and reduced it to writing. Most of the trainees entered the program after 1970.

(a) Maturity—at least 22 years of age and realistic appraisal of own ability and potential.

(b) Motivation—desire to learn and make a career of our business, and need the work.

(c) Education—at least high school graduate with emphasis on math, business, accounting, and human relations.

(d) Experience—general office with emphasis on detail and/or supervision, or counseling.

(e) Performance—record of consistency, established in the community with no obvious tendency or potential for moving.

(f) Personality—self-assured, friendly, neat in appearance, ability to command attention.

*    *    *    *    *    *

36. Regular Internal Services Department clerks were required to be able to type. The trainees in the Internal Services Department were not required to be able to type. If a trainee could type, then the trainee did his or her own typing when the job function required it.

37. The supervisor trainees became involved in and helped analyze supervisory problems and company policies. The trainees also made recommendations to management on solving problems. Regular clerks did not become involved in these aspects of UUIC's business.

38. The trainees were required to demonstrate an ability to adapt easily to changing job situations and requirements and an ability to learn to supervise new and complex jobs in a relatively short period of time, whereas the clerks were not required to demonstrate these skills.

39. Supervisor trainees were required to learn and understand all functions of the Internal Services Department. The regular clerks were required to learn only the specific job to which the clerk was assigned.

40. If the supervisor trainees, at any time, did not exhibit an aptitude for the supervisory aspects of the work, they were terminated. Clerks were not re-quired to exhibit an aptitude for the supervisory aspects of work.

41. Clerks were allowed more time than trainees to learn the specific job to which the clerk was assigned.

42. The supervisor trainees were expected to gain a comprehension of the reasons for the clerical work being done in Internal Services Department and the interrelationship of that work to other jobs in the company. The clerks were not expected to comprehend those subjects.

43. The supervisor trainees were required to learn the various jobs of the department from the viewpoint of understanding, not only the job content, but also the difficulties and frustrations of personnel in each job so as to be able to effectively supervise and motivate the clerks working on these jobs.

44. The supervisor trainees were required to learn the interrelationship of the various departments in the company and to be able to coordinate activities in the Internal Services Department with the activities of other departments in the company, whereas clerks did not have these responsibilities.

*    *    *    *    *    *

52. Supervisor trainees were given training that was not given to regular employees in the Internal Services Department.

53. Supervisor trainees were periodically evaluated during their training by supervisors and managers in the Internal Services Department. The evaluation system for trainees differed from that for clerks.

*    *    *    *    *    *

57. The trainees rotated between positions in the Internal Services Department. Although the length of time allotted for each trainee to learn the functions of the various departmental jobs was the same, time actually spent varied depending upon the particular trainee's aptitude. The training program rotation differed from normal personnel assignments, which, generally, were (a) not rotating

and (b) were for the purpose of producing work rather than training.

\* \* \* \* \* \*

59. In addition to the formal classroom-type training school, trainees were given additional training, dealing with supervisory skills, to which clerks in the Internal Services Department were not exposed.

60. Supervisor trainees attended meetings of the supervisors of the Internal Services Department, which meetings would vary in number and duration depending on the need for such supervisory meetings. These supervisory meetings were not generally open to non-supervisory employees.

On the basis of these findings, the district court made its ultimate finding that the work performed by the supervisory trainees required substantially greater skill, effort, and responsibility than the work performed by the clerks in the Internal Services Department. The court therefore concluded that UUIC did not violate the provisions of the Equal Pay Act by paying its trainees higher wages than its regular clerks.

██ In reviewing a district court's findings of fact in a discrimination action, we must make an independent determination of the court's ultimate finding of discrimination or nondiscrimination, but we remain bound by the court's subsidiary findings of fact unless they are clearly erroneous. *Strecker v. Grand Forks County Social Service Board*, 640 F.2d 96, 99 (8th Cir. 1981) (en banc). *See Shultz v. American Can Co.—Dixie Products*, 424 F.2d 356, 360 n.6 (8th Cir. 1970). Having carefully reviewed the record in this case, we cannot characterize the district court's subsidiary findings as clearly erroneous. Nor can we say that the district court erred as a matter of law in its ultimate finding that the supervisory trainees and the clerks did not perform substantially equal work.

On appeal, the EEOC challenges the district court's conclusion, arguing that the district court's own subsidiary findings of fact contradict its ultimate finding that UUIC did not discriminate on the basis of sex. In particular, the Commission singles out findings 35 and 48 as substantiating a violation of the Equal Pay Act:

35. The supervisor trainees spent most of their training time learning the work performed by the regular clerks in the Internal Services Department.

\* \* \* \* \* \*

48. A number of female employees in the Internal Services Department were also given informal training in supervisory skills, but were not officially admitted to the training program or paid a salary as high as that of the trainees.

Read in context, however, these two findings do not establish that the supervisory trainees and clerks performed substantially equal work. Although the supervisory trainees spent most of their training time "learning" the work performed by entry-level clerks in the Internal Services Department, the focus of the two jobs differed fundamentally. The clerks' job emphasized proficiency at carrying out a particular task. The clerks remained responsible for only that job to which they had been initially assigned. The trainees' job, in contrast, required only a basic understanding of the mechanics of that task and how it related to other jobs in the Company. Once the trainees "learned" a job, the management training program mandated a rotation to another job.[6] Further, trainees had to "learn"

---

**6.** Citing this court's decision in *Hodgson v. Security National Bank of Sioux City*, 460 F.2d 57 (8th Cir. 1972), the Commission claims that the Company's rotation of trainees was functionally indistinguishable from the movement of entry-level clerks in the normal course of employment. The rotation program in *Hodgson*, however, differs significantly from the one before us now.

The "trainees" did not rotate through various departments of the Bank in order to acquire detailed knowledge and comprehension of the Bank's whole operation, but rather, the rotation was confined to various paying-and-receiving windows. None of the male employees during the period here in question followed the specific rotation of the Bank's written management training program. The female tellers, too, followed a random rota-

the job in a shorter time period or face termination. Finally, the training program required the trainees to exhibit an aptitude for and receive training in supervisory skills. Although some female clerks also performed supervisory-like duties,[7] these supervisory duties do not necessarily establish that the clerks performed substantially equal work as the supervisory trainees. For purposes of the Equal Pay Act, the overall job, not individual segments of the job, determine whether two groups of employees perform substantially equal work.

Thus, our independent review of the district court record convinces us that the supervisory trainees performed work requiring greater skill, effort, and responsibility than the clerks in the Internal Services Department. As the Commission failed to establish a prima facie case of discrimination under the Equal Pay Act,[8] we need not rule on the Company's affirmative defense that its management training program constitutes a "factor other than sex" justifying the difference in wages paid to the trainees and the clerks.

Affirmed.

tion among the various paying-and-receiving windows. The rotation of male, as well as female, personnel appears to have been geared to the personnel needs of the Bank, and not to training requirements. [*Id.* at 61.] *Hodgson* differs from the present case in other respects as well. In that case, the male trainees were unaware that any training program existed and male applicants for employment received only assurances of advancement if "everything worked out." *Id.* In the present case, trainees applied directly to the management training program and the Company informed them that the program included rotation between positions in the Internal Services Department and that, upon completion of their training, they would be placed in a supervisory position.

7. Grade VII clerks checked work performed by others. Grade VIII employees reviewed the work of other employees and also had partial responsibility for determining which policies would be audited. Grade IX workers assigned work to and trained personnel, including the supervisory trainees.

8. We note that the EEOC brought this action under the Equal Pay Act, not under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.* Thus, we do not decide whether UUIC discriminated on the basis of sex under the provisions of Title VII.